[Civ. No. 11059.   Third Dist.   Feb. 1, 1966.]

EMMA RUTH CRAWFORD, a Minor, etc., Plaintiff and
Appellant, v. COUNTY OF SACRAMENTO, Defendant
and Respondent.

Colley & McGhee and Nathaniel S. Colley for Plaintiff and Appellant.

McLaughlin & Russell, McLaughlin, Russell, McCarthy & Kaelin and Clifford A. Russell for Defendant and Respondent.

PIERCE, P. J.—In this plaintiff's appeal in an action for wrongful death (medical malpractice) we hold that the trial court was justified in granting a nonsuit in favor of defendant county.

The principal contention that a "conditional" res ipsa

loquitur situation existed, viz., that death was the probable result of the negligence of defendant's anesthetist, fails because medical testimony neither established nor furnished evidence from which a lay jury could reasonably infer the probability of such negligence. A second contention that there was evidence other than the res ipsa inference sufficient to take the case to the jury and a third contention that evidence of an asserted admission by an intern (not present in surgery) was improperly excluded are also untenable.

### Re: *The Contention that Res Ipsa Loquitur Applied.*

On October 12, 1962, plaintiff's decedent, Fayrene Crawford, suffered an ankle fracture. She was taken to the defendant county hospital where a closed reduction was performed under a general anesthetic—sodium pentothal with nitrous oxide. The anesthesia was administered and the other functions pertaining thereto were performed by an anesthetist, a registered nurse, employed by the hospital. A Dr. Ryan was the surgeon who performed the reduction with a Dr. Bassinger assisting. The reduction was completed and a cast was applied to the leg. X-rays were taken and the films were read. The "operation record" (taken from the hospital records in evidence) over the doctor's signature reads: "At this time, the patient had a cardiac arrest, His [*sic*] BP could not be obtained in the extremities or directly over the heart. A cc of adrenalin was injected directly into the heart and external cardiac massage was immediately instituted. This was started approximately 4-5 seconds after it was known that the heart was not beating. After approximately 4-5 minutes, the pulse became palpable and the patient was taken to the RR [recovery room] with a Bennett respirator in action. *Prognosis*: Poor." The condition of the patient remained critical, and she died three days later despite admittedly proper efforts to save her life.

The hospital records and the testimony of the autopsy surgeon were the only medical evidence produced by plaintiff. Neither the anesthetist, the surgeon nor his assistant · was called, and none of them was a party defendant at the time of the trial. The autopsy surgeon was Dr. Arthur Wallace, and it is upon the basis of his testimony that plaintiff contends a "conditional" case of res ipsa loquitur was made out. Both Dr. Wallace's report, the coroner's report and Dr. Wallace's testimony show as the cause of death: "Infarction left internal capsule brain." Dr. Wallace stated that in lay-

man's language this meant a stroke; that "infarction" meant death of tissue. He had found the condition described by gross examination, and it had been confirmed by microscopic examination made by a pathologist. Speaking hypothetically, he explained that this condition can either be the cause or the result of a cardiac arrest during or following an operation.[1]

Summarized, the doctor's testimony was that the infarction was caused by a blocking of a cell or cells of the brain in a vital area. In laymen's terms the patient had suffered a stroke. This infarction was possibly the result of a blood clot. These blood clots are called emboli when traveling, thrombi when stationary. The brain cell infarction could have oc-

---

[1]We set forth verbatim some of the doctor's testimony, not necessarily in order of its statement in the record. Testimony of the doctor indicating the possibility that the infarction *caused* the heart to stop were:

"[The left internal capsule is a rather vital area where brain pathways travel and these impulses go to the lower centers and ultimately to the body itself outside the brain. Q. [A] vital and important portion of the brain? A. [C]arrying nerve pathways. Q. For the central nervous system? A. Yes sir. . . . The infarction means dead tissue, deprivation of oxygen in the blood supply to this local area and making it nonfunctioning, and of course, death of the body ensued. . . . Q. Doctor, can a clot cause a blockage of blood to the left internal capsule so as to cause an infarction? A. Yes. Q. That is the word you used when Mr. Colley was talking to you, an embolism? A. An embolus means a traveling clot. . . . A. . . . If a clot is stationary it is called a thrombus. . . . Q. This left internal infarction of the left internal capsule of the brain, that can occur at just about any time in a human being? A. It could, yes, sir. . . . Q. In other words, if you have an infarction of the left internal capsule of the brain a person can become comatose or unconscious? A. Right. Q. *You can have, Doctor, a cardiac arrest from infarction of the left internal capsule of the brain? A. I think that would be very likely to happen because these pathways travel through it. Some of them ultimately reach the heart through various nerves and such.*" (Italics added.)

Later in his testimony the doctor said: "A. The infarction certainly was caused by lack of circulation to this area. Q. What caused the lack of circulation? A. There are two factors which must be considered in this. *There are evidence of thrombi in other organs of the body, namely, the pulmonary arteries, but recent observations of the heart this morning showed a small clot in one of the coronary arteries which certainly this must have been caused by shutting off the blood supply to this area. . . .*" (Italics added.)

Earlier Dr. Wallace had testified: Q. But your examination showed no evidence of any embolus in this case? A. Microscopically, yes. There is a report that there are thrombus emboli, clotted blood within the lumen of the blood vessels of the lung. Q. Now, when you examined it you did not find any evidence of any embolus, did you? A. These were also microscopic examination. In fact, this morning I reviewed it again in the slides and there was a thrombus that had clotted in one of the blood vessels. That is in the lung. I, myself, did not see this. You cannot see these minute vessels without a microscope. Q. Did you have any way of determining when that embolus got there? A. No sir. Q. Is it possible it could be one of the terminal results? A. *It is possible it could have been there before this because after injury such as a fracture of an ankle you will*

curred while the patient was in surgery and could have been the product of an embolus or emboli breaking off from the clotted blood produced by the ankle fracture, thereafter traveling through the body. In this connection, the thrombus found at autopsy in the lungs was, according to the doctor, significant. If the brain cell infarction was thus caused, the cardiac arrest would have resulted and nothing connected with the process of giving anesthesia would have had any connection therewith.

On the other hand, the cardiac arrest could have been the cause rather than the result of the infarcted brain cells, since if the heart stops beating oxygen starvation of the brain would occur within three to five minutes thereafter.

The doctor stated a number of possible causes of cardiac arrest. One, the breaking off of an embolus from the fracture reaching the brain, has already been described. The doctor testified to other possible causes: "improper administration of drugs, excessive drugs. There possibly could be allergic factors entering this. The other factors primarily would be heart disease per se, coronary artery disease, valvular heart disease, previously damaged hearts."

Plaintiff's counsel in his examination of Dr. Wallace brought out that in the post mortem examination the heart appeared to be normal, without any valvular disease; there was an insignificant amount of sclerosis and no disease of coronary vessels; the pancreas, spleen, kidneys and uterus were normal.

The incidence of cardiac arrest during anesthesia is a rarity. Dr. Wallace agreed with an article cited by plaintiff's

---

get increased clotting ability of the blood. It will coagulate more readily than normal. This could be a factor in this case, too." (Italics added.)

Evidence by the doctor of the possibility that a cardiac arrest can cause an infarction of the brain was also present: "Q. [I]sn't it true you get something called hypoxia of the brain if the heart stops beating? A. Yes. That is lack of oxygen to the brain. Q. That does happen if your heart stops beating, your brain will be damaged because of lack of oxygen? A. That would be a fair question, yes, sir. Q. How long after the heart stops beating is required for irreversible damage to occur to the brain due to hypoxia? A. The figures generally used are three to five minutes. . . . Q. It depends on the particular person? A. Yes, it might be. . . . Q. Hypoxia and anoxia are two words meaning the same thing? A. Yes."

Later the doctor testified: "Q. Isn't it true a very low feeble heart beat causes blood not to move as fast as it should and not to be under pressure as it should be and this automatically causes some tendency to clot? A. That would be a factor. I believe we consider poor circulation within the coronary arteries a factor in causing coronary thrombosis. When these thrombi developed in this case it is very hard to ascertain. It is actually impossible."

counsel that the statistics varied from one case in 8,600 to one per 24,000.

█ From this medical testimony it is argued that there was sufficient evidence from which a lay jury could have inferred that more probably than not an improper or excessive amount of anesthesia was administered. We disagree. No testimony of Dr. Wallace could justify such an inference. He had found no evidence of either an overdose of drugs[2] or the improper administration thereof. In short, not a single finding of the doctor pointed to a cardiac arrest as a result of anything the anesthetist did or failed to do. On the contrary, such meager facts ascertained relevant to the unsolved problem of this woman's death pointed away from any fault of the anesthetist.

As stated above, the surgeon's report shows that this cardiac arrest had occurred after the reduction of the ankle had been completed and a cast applied. Dr. Wallace testified: ". . . After the operation is over the anesthesia is terminated. There is no need of it." The following also appears in the record: "Q. If a cardiac arrest occurs after the operation is over and after the anesthetizing agency has been shut off, would you say, Doctor, that it is more likely it was a stroke than anything else that brought about the cardiac arrest? A. That would be, I think also a fair statement. These cases like manipulating an ankle like was done in this case do not require too much anesthesia and if the anesthesia had been closed off, shut off and the patient was receiving oxygen and maybe was sent to the recovery room or something I wouldn't think there would be any influence on a cardiac arrest from the anesthetizing agent." The most that plaintiff proved in this case was that a cardiac arrest during surgery is rare and *can* be caused by an improper administration or excessive use of the anesthetizing drugs—that among a half dozen other causes at least one, a stroke from a fracture produced embolus, could have occurred here (the latter cause, according to Dr. Wallace, being the more likely). Upon such a record there was no evidence of a res ipsa loquitur inference to put before a jury.

---

[2]The doctor, having been asked if during his examination he had found any such evidence, said: ". . . The thing about it, it wouldn't manifest itself, especially because this person lived three days following the surgery, and we are able to do a toxiological examination for determination of drugs, but certainly pentothal and nitrous oxide and drugs used are completely out of the system in a very short space of time, and so there was no manifestation of an overdose and the toxologist certainly wouldn't show anything because these things are destroyed very quickly."

Recently this court in *Inouye* v. *Black* (Nov. 1965) 238 Cal.App.2d 31 [47 Cal.Rptr. 313] (speaking through Justice Friedman) had occasion to state the fundamental rules of res ipsa loquitur in relation to the granting or denial of a motion for nonsuit. ▆ We quote excerpts applicable here (pp. 33-34) : ". . . Briefly stated, the res ipsa loquitur doctrine creates an inference of negligence where, in the light of past experience, (a) the accident was probably the result of someone's negligence and (b) the defendant is probably the responsible person. (*Fowler* v. *Seaton*, 61 Cal.2d 681, 686 [39 Cal.Rptr. 881, 394 P.2d 697] ; *Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436, 446-447 [247 P.2d 344].) The plaintiff need not produce evidence excluding all possible causes other than the defendant's negligence. When the defendant's negligence is one of several possible causes reasonably inferable from the evidence, the choice or rejection of that particular inference must be left to the jury and cannot be assumed by the trial judge. [Citations.] Such a choice of inferences may be called 'conditional res ipsa loquitur.' (See *Quintal* v. *Laurel Grove Hospital*, 62 Cal.2d 154, 166 [41 Cal.Rptr. 577, 397 P.2d 161].)

▆ "In considering a nonsuit motion the trial judge must view the evidence in the light most favorable to the plaintiff. Thus, where there is any evidence to support the application of res ipsa loquitur, the trial court must deny a nonsuit motion. (*Greening* v. *General Air-Conditioning Corp.*, 233 Cal.App.2d 545, 553 [43 Cal.Rptr. 662] ; *Reynolds* v. *Natural Gas Equipment, Inc.*, 184 Cal.App.2d 724, 735-736 [7 Cal.Rptr. 879].)

▆ "To determine whether there is a reasonable probability of negligence causation, the courts rely on 'the light of past experience,' which in turn may be drawn from expert testimony or common knowledge. The more esoteric kinds of medical causation demand expert testimony; others are within the reach of lay experience. (Compare *Davis* v. *Memorial Hospital, supra*, 58 Cal.2d at pp. 817-818 [26 Cal.Rptr. 633, 376 P.2d 561], and *Siverson* v. *Weber*, 57 Cal.2d 834, 837 [22 Cal.Rptr. 337, 372 P.2d 97].)"

The type of accident which occurred in the instant case was clearly not one within the reach of lay experience. In some cases, however, medical testimony may narrow the field of possibilities so that a lay mind taking over where the medical testimony leaves off can properly draw an inference of a probability of negligence. Such a case was *Quintal* v.

*Laurel Grove Hospital,* 62 Cal.2d 154 [41 Cal.Rptr. 577, 397 P.2d 161]. There a patient died of a cardiac arrest. Medical evidence showed that it occurred during the performance of nonemergency surgery. That surgery could have been postponed with no ill consequences to the patient after the following preoperative conditions had been found to exist: (1) the patient was badly agitated; (2) preoperative medication for purposes of sedation was declared on the hospital report to be ''unsatisfactory''; (3) a possible high temperature existed, indicating a possible infection—this being a danger signal since infection causes a stimulation of the vagus nerve, which, in turn, is a cause of cardiac arrest. (An expert had testified that ''if a rise in temperature was caused by an infection the patient should not be submitted to anesthesia until the symptoms had been alleviated, preferably for about 72 hours.'') Medical evidence also showed that there were suspicious erasures from the hospital records. There was testimony that 90 percent of deaths occurring under anesthesia are due to improper management of the airway.

*Quintal, supra,* presented a close case of ''conditional'' res ipsa loquitur—as indicated by the fact it was decided by a divided court. No facts in the case at bench are similar to the facts there present.

■ ''The fact that a particular injury suffered by a patient as the result of an operation is something that rarely occurs does not in itself prove that the injury was probably caused by the negligence of those in charge of the operation. [Citations.]'' (*Siverson* v. *Weber,* 57 Cal.2d 834, 839 [22 Cal.Rptr. 337, 372 P.2d 97].) In *Quintal, supra,* it is said (at p. 165): ''Each case, of course, must be determined on its own facts.'' ■ As stated above, we cannot find in *this* case any facts which could justify giving this case to the jury under the doctrine of res ipsa loquitur—one of the conditions of which is that there must be evidence at least permitting a lay jury's inference that the accident was probably the result of negligence.

Re: *The Contention There was Sufficient Evidence for the Case to go to the Jury Regardless of Res Ipsa Loquitur.*

■ To support the captioned contention plaintiff urges there was evidence of a delay in the discovery of the cardiac arrest here which was negligent. Included in the hospital records is a statement by the operating surgeon: ''while

reading films after cast applied 30-45 min. of anesthesia [patient] became hypertensive. . . ."

Dr. Wallace testified that it is the duty of the anesthetist to watch the patient closely, administering the anesthetic, taking blood pressure, pulse, checking his pupils, etc. The anesthetist keeps a detailed graph which should show cardiac arrest the moment it happens. From this and Dr. Ryan's notes, quoted above, plaintiff urges that the jury could have assumed that here there had been a 15 minute interval during which the surgical team did not know whether or not a cardiac arrest had occurred. The inference is impermissible. Dr. Ryan's notes were merely a statement that he estimated the time lapse from the commencement of anesthesia to the moment of the cardiac arrest at from 30 to 45 minutes. The hospital records include the "Anesthesia record." It is very detailed. We cannot read it and do not believe any layman could. Neither the anesthetist herself, nor Dr. Ryan, nor Dr. Wallace, was asked to explain it. We do note thereon a statement which indicates that the anesthesia started at 11 a.m. and ended at 11:30 p.m. There was no evidence remotely suggesting that the anesthetist had breached her obligation of constant watchfulness.

Re: *The Contention the Evidence of an Asserted Declaration of the Intern was Improperly Excluded.*

After the patient had been returned to her hospital room, Dr. Delaney, an intern at the hospital, was assigned as her doctor. He had not been present during the surgery. The day after the operation, and while the patient was comatose, her sister, Mrs. Stewart, called. She asked for and was introduced to Dr. Delaney. She asked him what had happened, ". . . did they give her the wrong shot?" According to her, the doctor replied: "No, the shot was all right, but it was too much. . . . But I didn't give it."

The evidence was properly stricken. It was hearsay on hearsay. Dr. Delaney was not a party to the action. He had not been present at the operation. He was not a person who could be said to be an agent of the hospital within the meaning of Code of Civil Procedure section 1870, subdivision 5.[3]

---

[3]Code of Civil Procedure section 1870 provides: "In conformity with the preceding provisions, evidence may be given upon a trial of the following facts:

". . . . . . . . . . . . . . .

That section provides that declarations of an agent of a party made within the "scope of the agency" are admissible. The question of authorization, often a difficult one, is not difficult here. ██ An ordinary agent's admissions, not a part of the *res gestae,* are not competent evidence against his employer. (*Luman* v. *Golden Ancient Channel Min. Co.* (1903) 140 Cal. 700, 709 [74 P. 307]; *Shaver* v. *United Parcel Service* (1928) 90 Cal.App. 764, 770 [266 P. 606]; *Hollander* v. *Wilson Estate Co.* (1932) 214 Cal. 582, 586 [7 P.2d 177]; *Dillon* v. *Wallace* (1957) 148 Cal.App.2d 447, 452 [306 P.2d 1044].) Contra, where the agent is high in the "hierarchy" of the defendant corporation. In *Johnson* v. *Bimini Hot Springs* (1943) 56 Cal.App.2d 892, 902 [133 P.2d 650], an assistant manager of a corporation whose duties placed him in charge of a shower room of a public bath was held authorized to make admissions binding on the corporation regarding the soapy and slippery condition of the floor. In 6 California Law Revision Commission, Reports, Recommendations and Studies (1964), Hearsay Study, appendix, pages 484-490, a detailed study is made of the problem, cases are collected, and it is suggested that the differentiating factor in California cases is "the high place in the principal's hierarchy" occupied by the declarant. In the draft of the commission's reports cited a modifying rule was recommended (to be added to the new Evidence Code). The recommendation was that the code should erase the hierarchy distinction and make admissible admissions conerning *matters* within the scope of the agency, regardless of any authorization to made admissions, e.g., where D's chauffeur driving D's car for D runs into a pedestrian and the next day says, "I saw the light was red and saw you in the crosswalk—I just took an unlucky chance," evidence of such declaration should be admissible against the principal. It is significant that this recommendation was withdrawn, the suggested section adopting it was not included within California's new Evidence Code and California's "hierarchy rule" remains unless and until it is changed by statutory or case law. (See Cal. Law Rev. Com., Recommendation Proposing an Evidence Code, January 1965, p. 228, comment, § 1222.)

Discussion here of this matter is academic. ██ Dr.

"5. After proof of a partnership or agency, the act or declaration of a partner or agent of the party, within the scope of the partnership or agency, and during its existence. The same rule applies to the act or declaration of a joint owner, joint debtor, or other person jointly interested with the party; . . ."

Delaney, the intern, was neither high in the hospital's hierarchy and therefore its spokesman to make admissions, nor did the alleged admission concern a *matter* within the scope of his agency. He had not been present during the happening of the accident and was not shown to have been in a position to know what took place there. Evidence of his declaration was inadmissible and was properly rejected.

The judgment is affirmed.

Regan, J., and Warne, J. pro tem.,* concurred.

A petition for a rehearing was denied February 28, 1966, and appellant's petition for a hearing by the Supreme Court was denied March 30, 1966. Peters, J., Peek, J., and Mosk, J., were of the opinion that the petition should be granted.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.