HENRY ANDERSON, PLAINTIFF-RESPONDENT, v. HAROLD SOMBERG, REINHOLD-SCHUMANN, INC., A CORPORATION, ST. JAMES HOSPITAL, AND LAWTON INSTRUMENT COMPANY, A CORPORATION, DEFENDANTS-APPELLANTS.

Argued December 3, 1974—Decided April 29, 1975.

292

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

*Mr. Thomas F. Campion* argued the cause for defendant-appellant Harold Somberg (*Messrs. Shanley & Fisher,* attorneys; *Mr. Campion and Mr. Joseph L. Cook,* of counsel).

*Mr. John I. Lisowski* argued the cause for defendant-appellant Reinhold-Schumann, Inc. (*Messrs. Morgan, Melhuish, Monaghan, McCoid & Spielvogel,* attorneys; *Mr. James L. Melhuish,* of counsel and on the brief).

*Mr. Edward E. Kuebler* argued the cause for defendant-appellant St. James Hospital.

*Mr. Donald L. Berlin* argued the cause for defendant-appellant Lawton Instrument Co. (*Messrs. Lieb, Teich & Berlin,* attorneys).

*Mr. Ira J. Zarin* argued the cause for plaintiff-respondent (*Messrs. Zarin and Maran,* attorneys; *Mr. Zarin,* of counsel and on the brief).

The opinion of the Court was delivered by

PASHMAN, J. These negligence-products liability actions had their inception in a surgery performed in 1967 on the premises of defendant St. James Hospital (Hospital). Plaintiff was undergoing a laminectomy, a back operation, performed by defendant Dr. Somberg. During the course of the procedure, the tip or cup of an angulated pituitary rongeur, a forceps-like instrument, broke off while the tool was being manipulated in plaintiff's spinal canal. The surgeon attempted to retrieve the metal but was unable to do so. After repeated failure in that attempt, he terminated the operation. The imbedded fragment caused medical complications and further surgical interventions were required. Plaintiff

has suffered significant and permanent physical injury proximately caused by the rongeur fragment which lodged in his spine.

Plaintiff sued: (1) Dr. Somberg for medical malpractice, alleging that the doctor's negligent action caused the rongeur to break: (2) St. James Hospital, alleging that it negligently furnished Dr. Somberg with a defective surgical instrument; (3) Reinhold-Schumann, Inc. (Reinhold), the medical supply distributor which furnished the defective rongeur to the hospital, on a warranty theory, and (4) Lawton Instrument Company (Lawton), the manufacturer of the rongeur, on a strict liability in tort claim, alleging that the rongeur was a defective product. In short, plaintiff sued all who might have been liable for his injury, absent some alternative explanation such as contributory negligence.

Dr. Somberg testified that he had not examined the rongeur prior to the day of surgery. He inspected it visually when the nurse handed it to him during the operation, and manipulated its handles to make certain it was functional. The doctor stated that he did not twist the instrument, and claimed that the manner in which the instrument was inserted in plaintiff's body precluded the possibility of twisting. He noted the absence of one of the rongeur's cups when he withdrew the instrument from plaintiff's spinal canal, but his efforts to retrieve the fragment proved of no avail.

Dr. Graubard, a general surgeon, testified as an expert witness for plaintiff. He stated that the rongeur was a delicate instrument, a tool not to be "used incorrectly or with excessive force or to be used against hard substances." He claimed that a twisting of the instrument might cause it to break at the cups. Dr. Graubard stated that a "rongeur used properly and not defective would not break."

The deposition of the operating room supervisor of defendant hospital, Sister Carmen Joseph, was read into the record. She was responsible for visually examining and

sterilizing all instruments prior to surgery. The rongeur in question was used about five times a year, and had been used about 20 times before this operation. She did not know who had taken out the rongeur for this operation; she had not worked the day of plaintiff's operation.

The hospital's purchasing agent testified that the rongeur had been purchased from the distributor, Reinhold, about four years prior to plaintiff's surgery and was received in a box bearing the name of the manufacturer, Lawton. The owner of Reinhold testified that the rongeur was not a stock item and had to be specially ordered from Lawton upon receipt of the hospital purchase order. The box was opened at Reinhold's warehouse, to verify that it was a rongeur and it was then forwarded to the hospital.

Defendant Lawton called a metallurgist, a Mr. John Carroll, as an expert witness. He testified that an examination of the broken rongeur revealed neither structural defect nor faulty workmanship. He said that the examination (conducted at an optical magnification 500 times normal size) revealed a secondary crack near the main crack but he could not suggest how or when that crack formed. Mr. Carroll offered an opinion as to the cause of the instrument's breaking: the instrument had been strained, he said, probably because of an improper "twisting" of the tool. The strain, however, could have been cumulative, over the course of several operations, and the instrument could conceivably have been cracked when handed to Dr. Somberg and broken in its normal use.

In short, when all the evidence had been presented, no theory for the cause of the rongeur's breaking was within reasonable contemplation save for the possible negligence of Dr. Somberg in using the instrument, or the possibility that the surgeon had been given a defective instrument, which defect would be attributable to a dereliction of duty by the manufacturer, the distributor, the hospital or all of them.

The case was submitted to a jury on special interrogatories, and the jury returned a finding of no cause as to each defendant. On appeal, the entire Appellate panel concurred in an order for a new trial. A majority held that the verdict represented a miscarriage of justice, and that on the facts of this case it was clear that one of the parties was liable and the jury should have been told that it had to return a verdict against at least one of the defendants. The concurring opinion writer argued that the jury had not been properly instructed on its prerogatives to find for plaintiff; but he felt that the order for a directed verdict against an unnamed defendant was an invitation to the jury to guess which defendant was liable. Accordingly, the concurrence urged that the case be remanded for trial, and that the jury be instructed that plaintiff had made out a very strong prima facie case. Certification was granted. 63 N. J. 586 (1973).

First, we note that the suggestion in the concurring opinion that the case be sent back on "strengthened" instructions is little more than a pretext for giving plaintiff a second chance before a jury. Neither in the Appellate Division nor before this Court has it been alleged, let alone demonstrated, that the charge did not comport with the standard charge for a "strong" prima facie case made out by *res ipsa loquitur* (thought to be appropriate here). Indeed, the trial judge very adequately explained to the jury that plaintiff, given all favorable inferences, could be said to have proved his case.[1] See *Vespe v. Di Marco*, 43 N. J. 430, 439 (1964).

---

[1]The charge included the following:

The right of the defendants to have the plaintiff bear the required burden is a substantial one and not a mere matter of form. This burden may be sustained, however, on the basis of all of the evidence in this case and the legitimate inference to be drawn from it. And in this connection you may consider that the defendants were the only one shown to have any relationship with the pituitary rongeur which broke during the course of the operation. And you may infer

■ The position adopted by the Appellate Division majority seems to us substantially correct: that is, at the close of all the evidence, it was apparent that at least one of the defendants was liable for plaintiff's injury, because no alternative theory of liability was within reasonable contemplation. Since defendants had engaged in conduct which activated legal obligations by each of them to plaintiff, the jury should have been instructed that the failure of any defendant to prove his nonculpability would trigger liability; and further, that since at least one of the defendants could not sustain his burden of proof, at least one would be liable. A no cause of action verdict against all primary and third-party defendants will be unacceptable and would work a miscarriage of justice sufficient to require a new trial. *R.* 2 :10–1.

■ In the ordinary case, the law will not assist an innocent plaintiff at the expense of an innocent defendant. However, in the type of case we consider here, where an unconscious or helpless patient suffers an admitted mishap not reasonably foreseeable and unrelated to the scope of the surgery (such as cases where foreign objects are left in the body of the patient), those who had custody of the patient, and who owed him a duty of care as to medical treatment, or not to furnish a defective instrument for use in such treatment can be called to account for their default. They must prove their nonculpability, or else risk liability for the injuries suffered.

This case resembles the ordinary medical malpractice foreign-objects case, where the patient is sewn up with a surgical tool or sponge inside him. In those cases, *res ipsa loquitur* is used to make out a prima facie case. *Martin v. Perth Amboy General Hospital,* 104 *N. J. Super.* 335, 342 (App. Div. 1969) ; *Gould v. Winokur,* 98 *N. J. Super.* 554 (Law Div. 1968), aff'd 104 *N. J. Super.* 329 (App. Div.

that the breaking was attributable to dereliction on the part of one or other of the defendants in this case.

1969), certif. den. 53 *N. J.* 582 (1969); Annotation, "Malpractice — Res Ipsa Loquitur," 82 *A. L. R.* 2d 1262; Annotation, "Malpractice — Foreign Object Left in Patient," 10 *A. L. R.* 3d 9; *cf. Williams v. Chamberlain,* 316 *S. W.* 2d 505 (Mo. 1958) (breaking of hypodermic needle did not make out prima facie case).

█ The rule of evidence we set forth does not represent the doctrine of *res ipsa loquitur* as it has been traditionally understood. *Res ipsa loquitur* is ordinarily impressed only where the injury more probably than not has resulted from negligence of the defendant, *Germann v. Matriss,* 55 *N. J.* 193 (1970), and defendant was in exclusive control of the instrument. *Magner v. Beth Israel Hospital,* 120 *N. J. Super.* 529 (App. Div. 1972), certif. den. 62 *N. J.* 199 (1973); *Rose v. Port of New York Authority,* 61 *N. J.* 129 (1972). The doctrine has been expanded to include, as in the instant matter, multiple defendants, *Jackson v. Magnavox Corp.,* 116 *N. J. Super.* 1, 17 (App. Div. 1971); *Ybarra v. Spangard,* 25 *Cal.* 2d 486, 154 *P.* 2d 687 (Sup. Ct. 1948), although even this expansion has been criticized, see Adamson, "Medical Malpractice: Misuse of Res Ipsa Loquitur," 46 *Minn. L. Rev.* 1043 (1962); Seavey, "Res Ipsa Loquitur: Tabula in Naufragio," 63 *Harv. L. Rev.* 643 (1950). It has also been expanded to embrace cases where the negligence cause was not the only or most probable theory in the case, but where the alternate theories of liability accounted for the only possible causes of injury. *Dierman v. Providence Hospital,* 31 *Cal.* 2d 290, 188 *P.* 2d 12 (Sup. Ct. 1947); *Burr v. Sherwin Williams Co.,* 258 *P.* 2d 58 (Cal. Dist. App. 1953), rev'd 42 *Cal.* 2d 682, 268 *P.* 2d 1041 (Sup. Ct. 1954). That is the situation in this case, where we find negligence, strict liability in tort and breach of warranty all advanced as possible theories of liability. In such cases, defendants are required to come forward and give their evidence. The latter development represents a substantial deviation from earlier conceptions

of *res ipsa loquitur* and has more accurately been called "akin to *res ipsa loquitur*," *NOPCO Chem. Div. v. Blaw-Knox Co.*, 59 *N. J.* 274 (1971), or "conditional *res ipsa loquitur*," *Quintal v. Laurel Grove Hospital*, 62 *Cal.* 2d 154, 166, 41 *Cal. Rptr.* 577, 397 *P.* 2d 161 (Sup. Ct. 1965); *cf.* the dissent of Chief Justice Weintraub in *Jakubowski v. Minnesota Mining and Manufacturing Co.*, 42 *N. J.* 177, 188 (1964).

In *NOPCO Chem. Div. v. Blaw-Knox Co.*, *supra*, the liability for damages to a delivered product could be attributed with great probability either to the negligence of any one in a series of bailees or the breach of warranty of the seller. The Court stated that when several defendants individually owe plaintiff a duty, and all might have caused his loss and have superior knowledge of the occurrence, they all are bound to come forward and give an account of what happened. In that case, the application of *res ipsa loquitur* was thought to call for an explanatory rather than an exculpatory account, which would be sufficient to meet defendant's burden, according to the traditional rule. *Kahalili v. Rosecliff Realty, Inc.*, 26 *N. J.* 595, 66 *A. L. R.* 2d 680 (1958). See generally, Kimball, "Res Ipsa Loquitur in Suits Against Multiple Defendants," 34 *Alb. L. Rev.* 106 (1969); *Dierman v. Providence Hospital*, *supra*, 188 *P.* 2d at 15 (dissenting opinion).

In *NOPCO*, however, plaintiff is still made to bear the burden of proof vis-a-vis each defendant, and, it was upon such instruction that the present case was submitted to the jury. We now hold that a mere shift in the burden of going forward, as adopted in *NOPCO*, is insufficient. For this particular type of case, an equitable alignment of duties owed plaintiff requires that not only the burden of going forward shift to defendants, but the actual burden of proof as well. Since at least one primary or third-party defendant must inevitably fail to meet his burden, a verdict must be returned for the plaintiff.

The California cases have taken that turn despite some language to the contrary, and defendants have been required to make: "an affirmative showing [1] of a definite cause for the accident in which cause no element of negligence on the part of the defendant inheres; or (2) of such care in all possible respects as necessarily to lead to the conclusion that the accident could not have happened from want of care, but must have been due to some unpreventable cause, although the exact cause is unknown," *Dierman v. Providence Hospital, supra,* 188 *P.* 2d at 15, quoting *Bourguignon v. Peninsular Ry. Co.,* 40 *Cal. App.* 689, 694, 695, 181 *P.* 669, 671 (1919). *Cf.* Justice Traynor's dissent in that case argues that the majority's rule could make plaintiff's medical attendants insurers of his safety. We accept the approach of the *Dierman* majority, which reversed a no cause verdict against plaintiff, and remanded for trial, apparently upon new instructions that defendants in this type of medical malpractice case should be made to exculpate themselves where clearly plaintiff was not at fault. *Cf. Clark v. Gibbons,* 66 *Cal.* 2d 399, 58 *Cal. Rptr.* 125, 426 *P.* 2d 525 (1967); *Raber v. Tumin,* 36 *Cal.* 2d 654, 664, 226 *P.* 2d 574, 580 (1951) (dissenting opinion); see Louisell and Williams, "Res Ipsa Loquitur — Its Future in Medical Malpractice Cases," 48 *Cal. L. Rev.* 252, 256 (1960), suggesting that in unconscious-patients cases a *res ipsa*-like charge ought to shift the actual burden of proof. At least one writer has argued that the burden of proof rule should be adopted on the basis of an explicit recognition that the risk of unexplained injuries in these unconscious-patient situations should lie with those who were in custody of the body or who owed a duty to the patient (*e. g.,* as the manufacturers of surgical tools). Thode, "The Unconscious Patient: Who Should Bear The Risk of Unexplained Injuries to A Healthy Part of His Body?," 1969 *Utah L. Rev.* 1. See Seavey, "Res Ipsa Loquitur: Tabula in Naufragio," *supra,* 63 *Harv. L. Rev.* at 646–647.

The imposition of the burden of proof upon multiple defendants, even though only one could have caused the injury, is no novelty to the law, as where all defendants have been clearly negligent. *Summers v. Tice,* 33 *Cal.* 2d 80, 199 P. 2d 1 (1948). As against multiple defendants where there is no evidence as to where culpability lies, the rule is not generally available, according to Prosser, because it might impose an equal hardship on an innocent defendant as on an innocent plaintiff. Prosser notes exceptional special cases, as where defendant owes a special responsibility to plaintiff, and in those instances the burden of proof can in fact be shifted to defendants. *Prosser, Torts* (4 ed. 1973), *pp.* 243–244, 231, 223. The facts of this case disclose just such a special responsibility, and require a shifting of the burden of proof to defendants.

We hold that in a situation like this, the burden of proof in fact does shift to defendants. All those in custody of that patient or who owed him a duty, as here, the manufacturer and the distributor, should be called forward and should be made to prove their freedom from liability.[2] The rule would have no application except in those instances where the injury lay outside the ambit of the surgical procedure in question; for example, an injury to an organ, when that organ was itself the object of medical attention, would not by itself make out a prima facie case for malpractice or shift the burden of proof to defendants. *Farber v. Olkon,* 40 *Cal.* 2d 503, 254 P. 2d 520, 524 (1953).

---

[2]The dissent concedes the justification of a rule shifting the burden of proof as to negligence charges. *Post.* p. 310, fn. 5. But the dissenters in a footnote are critical of, among other things, the provision in this decision for a shift in burden where plaintiff has sued on counts of strict liability in tort and breach of warranty. This shift is applicable only in the particular factual situation involved in this type of case. In this factual pattern where such a shift is appropriate, it does not depend upon the specific theory of liability advanced by the plaintiff; in a factual situation where such a shift is not appropriate, the plaintiff cannot obtain its benefits by choosing one legal theory or another.

Further, we note that at the close of all the evidence, no reasonable suggestion had been offered that the occurrence could have arisen because of plaintiff's contributory negligence, or some act of nature; that is, there was no explanation for the occurrence in the case save for negligence or defect on the part of someone connected with the manufacture, handling, or use of the instrument. (Any such proof would be acceptable to negative plaintiff's prima facie case.) Since all parties had been joined who could reasonably have been connected with that negligence or defect, it was clear that one of those parties was liable, and at least one could not succeed in his proofs.[3]

In cases of this type, no defendant will be entitled to prevail on a motion for judgment until all the proofs have been presented to the court and jury. The judge may grant any motion bearing in mind that the plaintiff must recover a verdict against at least one defendant. Inferences and doubts at this stage are resolved in favor of the plaintiff. If only one defendant remains by reason of the court's action, then, in fact, the judge is directing a verdict of liability against that defendant.

The holding of the Court in this matter will, according to the dissenters, remove from the judicial process "any semblance of rationality" and reduce it to "trial by lot, or by chance." The objections which they raise, however, hardly justify this resplendently apocalyptic rhetoric.

The dissenters are concerned with the possibility that there will be cases in which a foreign object is left in the

---

[3]We note that a *res ipsa* charge has been denied where there are other equally probable multiple causes, but the agents of those other causes were not joined; for example, where a wire in plaintiff's body shattered, *res ipsa* was not available against the doctor when neither the manufacturer nor the hospital that supplied it was joined. *Inouye v. Black*, 238 *Cal. App.* 2d 31, 47 *Cal. Rptr.* 313, 14 A. L. R. 3d 961 (D. Ct. App. 1965) ; *Crawford v. County of Sacramento*, 239 *Cal. App.* 2d 791, 49 *Cal. Rptr.* 115 (D. Ct. App. 1966) ; *cf. Talbot v. Dr. W. H. Groves' Latter Day Saints Hospital*, 21 *Utah* 2d 73, 440 *P.* 2d 872 (1968).

body of the plaintiff after surgery — a fact which bespeaks tortious conduct on the part of somebody[4] — and all persons who might reasonably have been liable for the injury are before the court, but none of the parties, in fact, acted tortiously. They express dismay that in such cases, which they anticipate will be "many," juries will be obliged to act contrary to their oaths and that liability will be imposed on wholly innocent parties.

Once stated in simple language, free of the epithets with which the dissenters have clothed it, the objection largely evaporates. Almost by definition, one or more of the defendants are liable. Identifying the responsible party is merely a matter of elimination. To instruct the jury that it must return a verdict against one or more of the defendants is simply requiring it to determine upon the evidence which defendants, if any, have exculpated themselves. For the jury under these circumstances to conclude that no defendant is liable would be a contradiction in logic. Certainly this procedure neither compels jurors to violate their oaths nor leads to random and haphazard imposition of liability as alleged by the dissent.

The dissenters also accuse the Court of deliberately and perversely ignoring the fact — known, they assert, by everyone associated with the case — that not all conceivable defendants are before the trial court. The accusation is, of course, true. Anyone with a moderately fertile imagination could conceive of other persons whose conduct might have caused the injury. Indeed, as the dissenters are at pains to note, two witnesses did speculate that another doctor might have damaged the rongeur within the preceding four years, and, while none of the witnesses or parties have thus far suggested the possibility, the Court on its own motion might note that it is also conceivable that some unknown enemy

---

[4]We do not consider here the special case of medical procedures which are foreseeably hazardous by the very reason of an exceptional risk that foreign objects might be left in the patient's body.

of Mr. Anderson might have slipped into the hospital prior to the operation and deliberately damaged the instrument or that some unknown disgruntled employee of Rheinhold-Schumann or Lawton Instrument might have done so.

Nevertheless, the fact remains that involvement by any person other than the defendants actually before the court below has never been asserted as anything other than pure and undisguised speculation. None of the defendants introduced any evidence to actually support the claim of responsibility by other persons; they made no effort to join additional parties.[5] It would be exceedingly unjust to deny plaintiff compensation simply because an imaginative defendant can conceive of other possible parties. On the record presently before the Court, the contention of the dissent, that the Court is "visiting liability * * * upon parties who are more probably than not totally free of blame," is, at best, an exercise in judicial hyperbole.

A wholly faultless plaintiff should not fail in his cause of action by reason of defendants who have it within their power to prove nonculpability but do not do so. See Broder, "Res Ipsa Loquitur in Medical Mal-Practice Cases," 18 *De Paul L. Rev.* 421, 422-23 (1969). In this case, the balance of equities requires no less.

The judgment of the Appellate Division is hereby affirmed, and the cause remanded for trial upon instructions consonant with this opinion.

JACOBS, J., concurs in the result but votes to affirm on the majority opinion rendered in the Appellate Division.

MOUNTAIN, J., dissenting. This Court has reached an extraordinary result in a very remarkable way. As I shall hope to make clear, the structure of argument as presented

---

[5] On remand, defendants will have the opportunity to engage in discovery so as to identify possible additional defendants and will have the benefit of our liberal joinder rules. *R.* 4:8-1, *R.* 4:29-1(a), *R.* 4:30.

in the Court's opinion is rested upon an assumed factual premise which does not exist. In part because of this, the concluding and most significant part of the argument suffers from the defect of visiting liability, in a wholly irrational way, upon parties who are more probably than not totally free of blame. I respectfully dissent.

During the course of the Court's opinion there appear statements to the effect that all those who might have been in any way responsible for plaintiff's injury are before the court.[1] Hence, the argument continues, a process of selection properly undertaken by the finder of fact cannot fail to implicate the true culprit or culprits. Indeed, as I read the opinion, the entire argument is made to rest upon this premise: each and every person who may have brought about the imperfection in the surgical instrument or who may have caused the injury by its misuse is before the court; it remains only to identify him.

And yet we know — and everyone who has been associated with this case has always known — that this assumption is not in fact true. The only four defendants in the case are: the surgeon, Dr. Harold Somberg, who performed the operation; St. James Hospital, the medical facility in which the operation took place; Lawton Instrument Co., which manufactured the rongeur; and Rheinhold-Schumann, Inc., the distributor which sold it to the hospital. There is no other defendant in the case. And yet the record is replete with testimony that other surgeons — perhaps as many as twenty — have used the rongeur during the four years that it has formed part of the surgical equipment of the hospital, and that any one or more of them may perfectly well have been responsible for so injuring the instrument that it came apart while being manipulated in plain-

---

[1] ". . . plaintiff sued all who might have been liable for his injury . . ." (*P.* 295). "Since all parties had been joined who could reasonably have been connected with that negligence or defect, it was clear that one of those parties was liable . . ." (*P.* 303).

tiff's incision; or that it may have been weakened to near breaking point by cumulative misuse, entirely by persons not now before the court.[2] In the face of this uncontro-

[2]There was uncontradicted testimony that the rongeur had been purchased by the hospital about four years before the date of plaintiff's operation, [T 2.70], and that during that span of time it had been used about twenty times in the performance of operations. [T 2.65–66; p. 296]

On the cross-examination of Dr. David J. Graubard, plaintiff's medical expert, the following occurred:

Q  Well, Doctor, suppose — assume, if you would, that on a prior occasion the rongeur had been used improperly, exerting too much force and the cup had been bent by a surgeon who just happened to have — who just happened to be on the hospital staff, had privileges at the hospital and the doctor straightened it, would that weaken the instrument?

A  Yes.

Q  And that could at a later date cause it to break, isn't that correct?

A  Yes, sir.                                               [T 2.139]

During the interrogation of John Carroll, an expert in metallurgy called by defendant, Lawton Instrument Co., the following colloquies took place:

Q  Do you think it [the rongeur] was overstrained, though, in its use?

A.  At some point during its use. I couldn't say specifically when.
                                                          [T 4.34]

Q  Now, you said, I believe, that at some point in the use it [the rongeur] was over-strained?

A  Yes, sir.

Q  Now, what did you mean by that?

A  I meant that, to use a technical term, it was loaded beyond the yield point. And the yield point of a material is a load at which it loses elasticity, does not return to the original shape.

Q  But you can handle over-straining without simultaneous fracture, can't you?

A  Any time you bend anything you strain it.

Q  And if you bend it sufficiently enough during the course of its use at some point in time it's going to break because it's far over-strained above the point of its ability to take a pressure or load?

A  In the sense that over-straining means weakening.

Q  Right. So that it is possible for an instrument such as a pituitary rongeur to be weakened through use over a period of time and at a final point in time break?

A  Yes, sir.                                              [T 4.43]

verted proof that the surgical instrument had been used upon approximately twenty earlier occasions and possibly by the same number of different surgeons, in the hands of any of whom it may have been fatally misused, how then can it be said that the wrongdoer is surely in court! There is a far greater likelihood that he is no party to this litigation at all and that his identity will never be established.

I of course agree with the Court that it is most unfortunate that this plaintiff should go uncompensated. Every humanitarian instinct impels the hope that when an unconscious patient is injured in some unforeseen and unforeseeable way, due reparation will be forthcoming. It is to the manner in which the Court would seek to fulfill this hope that I object.

As the opinion of the Court has been careful to point out, (P. 305), plaintiff's claims against the surgeon, Dr. Somberg, and against the hospital sound in negligence;[3]

Q So then you found, Mr. Carroll, that it had been stressed?
A Yes, sir.
Q Beyond it's ability to tolerate, is that correct?
A That's correct, sir.
Q Stressed over a period of time perhaps, probably?
A I couldn't answer that as to time, sir. It could have happened during the course of one operation or many operations.
Q You know it was stressed beyond its ability to tolerate that stress?
A Yes, sir.
Q In its use?          A. Yes.
Q The point of time you can't pinpoint?
A I cannot.          [T 4.50]

[3]Not presented for consideration under the pleadings and not touched upon by the parties or any of the courts before which this case has come is the issue of whether a hospital *at its peril* puts into the hands of a surgeon a defective instrument, such as everyone seems to agree was the condition of the rongeur here, no matter how that defect came about. The state of the law in New Jersey thus remains open as to whether strict liability in tort might be available against the hospital here, see generally *Johnson v. Sears, Roebuck & Co.*, 355 *F. Supp.* 1065 (E. D. Wis. 1973); Note, Torts — Strict Liability — Hospitals May be Strictly Liable for Administrative Services, 41 *Tenn. L. Rev.* 392 (1974); *cf. Magrine v. Spector*, 100

his claims against the manufacturer and distributor, on the other hand, are stated as arising from alleged breach of warranty or as resting upon a theory of strict liability in tort. At the conclusion of the plaintiff's case it had become apparent that with respect to his negligence claims he was entitled to invoke the doctrine of *res ipsa loquitur*.[4] The fracture of the rongeur in the wound bespoke negligence on the part of someone, the instrument was at the time within the control of a defendant and the injury was clearly not attributable to any fault or neglect on the part of the plaintiff. *Rose v. Port of New York Authority*, 61 *N. J.* 129, 136 (1972); *Kahalili v. Rosecliff Realty, Inc.*, 26 *N. J.* 595, 605–607 (1958).

The opinion takes the view that at this point the burden

*N. J. Super.* 223, 255–41 (App. Div. 1968) (Botter, J. S. C., dissenting); Farnsworth, "Implied Warranties of Quality in Non-Sales Cases," 57 *Colum. L. Rev.* 653 (1957); or whether, in appropriate circumstances, a court might recognize an absolute duty of some other origin under which a hospital would be required to furnish a surgeon with a non-defective instrument.

[4]It has hitherto been the generally accepted rule that the doctrine of *res ipsa loquitur* has no application to cases involving alleged breach of warranty. "The doctrine of res ipsa loquitur relates to cases involving negligence and has no application to an alleged breach of warranty." *Trust v. Arden Farms Co.*, 50 *Cal.* 2d 217, 324 *P.* 2d 583, 586 (1958). Nevertheless the manner in which inferences of defective manufacture may be drawn from factual circumstances in breach of warranty or strict tort liability cases is not very different from the way in which inferences of negligence may be drawn where *res ipsa loquitur* properly applies. "The doctrine of res ipsa loquitur, frequently resorted to in negligence cases, is not applicable as such in the field of warranty, although the usual resort to circumstantial evidence in attempting to establish a breach of warranty indicates some of the same thinking found in res ipsa loquitur cases." *State Farm Mut. Auto Ins. Co. v. Anderson-Weber Inc.*, 252 *Iowa* 1289, 110 *N. W.* 2d 449, 452 (1961). This similarity was noted by this Court in *Corbin v. Camden Coca-Cola Bottling Co.*, 60 *N. J.* 425, 436 (1972), holding that a res ipsa charge in a products liability case resting upon strict tort liability would not, at least in that case, be deemed reversible error.

of proof shifted to defendants.[5] This, as is apparently conceded, has not hitherto been the law of this State. "The operation of this rule of evidence [*res ipsa loquitur*] does not shift the burden of persuasion. [citing authorities]." *Bornstein v. Metropolitan Bottling Co.*, 26 *N. J.* 263, 269 (1958). Nevertheless this alteration in the law may be entirely reasonable and justified — at least if limited to this kind of medical malpractice case. 1 *Louisell & Williams, Medical Malpractice* sec. 15.02 *et seq*. In any event the argument as to the procedural effect to be given the rule of *res ipsa* has well been called "a tempest in a teapot." 2 *Harper & James, The Law of Torts* (1956) sec. 19.11, p. 1104. Parenthetically, it may be pointed out that the duty of explanation on the part of a surgeon, when unforeseen injury occurs, is always inherent in the relationship between physician and patient. 1 *Louisell & Williams, Medical Malpractice, supra,* sec. 15.01. Thus far, as to the negligence claims, I might be persuaded to agree with the Court.

But certainly no farther. At this point the *effect* to be given a shift in the burden of proof becomes the crucial issue. The authorities which have adopted or espoused the view that *res ipsa* shifts the burden of proof have, as far as I can discover, understood this to mean that upon such a shift taking place, a defendant becomes obliged to offer evidence explaining his own conduct or throwing light upon the circumstances attending plaintiff's injury, which will be of sufficient probative force to establish his lack of fault by a preponderance of the evidence. The fact finder will then be called upon to decide whether the defendant's proofs have met this test or whether they have fallen short.

---

[5]Apparently, as to a shift in burden of proof, no distinction is to be drawn between those defendants charged with negligence and those against whom breach of warranty is asserted. While, as I concede immediately below, a rule shifting the burden of proof may perhaps be justified here as to the negligence charges, it certainly should never, either here or elsewhere, pertain to products liability claims.

The view expressed by the Court in this case as to the effect of shifting the burden of proof appears to be something quite different. Under this new rule it is no longer enough that a defendant meet the standard described above. His role is no longer simply that of one who may hope to succeed if his proofs justify a verdict. Rather he now finds himself one of a band of persons from among whom one or more *must* be singled out to respond in damages to the plaintiff's claim. He is now a member of a group who must collectively, among themselves, play a game of *sauve qui peut* — and play it for rather high stakes. With all due respect I submit that at this point there has been complete departure from the rule of reason; the argument is now stripped of all rational basis.

Note, first, the role the jury is being called upon to play. The judge will give to the jury two potentially contradictory instructions. First the jurors will be told to arrive at a verdict by a preponderance of the evidence, each defendant having the burden of exculpating himself. Then a further direction will be given that they *must* bring in a verdict against some one or more of the defendants. But suppose the members of the jury cannot agree that the evidence will sustain a verdict against *any* defendant. What then! Each juror has taken an oath — no small matter — to reach a verdict only "according to the evidence."[6] What does he now do? Presumably he poses his problem to the judge. And upon seeking the aid of the court, what further instructions is he to be given?

What is to be the posture of the judge if he is thereafter called upon to rule upon a motion for judgment notwith-

---

[6]To petit jurors in New Jersey there is administered the following oath:

> You do swear in the presence of Almighty God that you will well and truly try the matter in dispute between ............, plaintiff and ............, defendant, and a true verdict give *according to the evidence*. [*N. J. S. A.* 2A:74–6; emphasis supplied]

standing the verdict or for a new trial, and it is perfectly clear to him that the verdict could not be supported by the evidence and was rendered only in response to the compulsion of this proposed charge? I leave the answers to these questions to those jurors and judges who must in the future act under the shadow of this decision.

Consider further the hypothesis last suggested, that a jury does undertake, despite a failure of adequate proof, to carry out the mandate of this instruction. How is a verdict to be reached? The absence of sufficient evidence upon which a verdict might justly rest, coupled with the compulsion to reach a verdict against *someone,* removes from the case any semblance of rationality. It then becomes a mere game of chance. There being no rational guide, each jury may proceed as the whimsy of the moment dictates. Thus we have trial by lot, or by chance — no more a rational process than were trial by ordeal or trial by combat. And yet it is the very essence of the judicial process that a determination reached by a court shall be the result of a rational study and analysis of applicable fact and law.[7]

---

[7]Justice (now Chief Judge) Breitel has expressed the point well:

The primary internal characteristic of the judicial process is that it is a rational one. The judicial process is based on reasoning and presupposes — all antirationalists to the contrary notwithstanding — that its determinations are justified only when explained or explainable in reason. No poll, no majority vote of the affected, no rule of expediency, and certainly no confessedly subjective or idiosyncratic view justifies a judicial determination.

\* \* \* \* \* \*

The rational judicial process is not permitted to rove generally over the scene of human affairs. Instead, it must be used, on pain of violating the proprieties, within the framework of a highly disciplined special system of legal rules characteristic of the legal order. No principle of the moral order or any other by itself may demand recognition in the judicial process of dispute determination except as it is incorporated or can be incorporated into the system of legal rules. [*Breitel, The Lawmakers,* 65 *Colum. L. Rev.* 749, 772–3 (1965)]

Nor can it be seriously contended that in following the course outlined by the Court there would not be instances — perhaps many — where liability would be visited upon wholly innocent persons. I cannot concur in a decision announcing a rule of law which invites such a result.

It is, of course, generally accepted as axiomatic in a society dedicated to the values of individualism, that no person shall be made to answer for an event, unless his responsibility for it has been convincingly proved by due process of law. [*Fleming, Developments in the English Law of Medical Liability*, 12 *Vand. L. Rev.* 633, 646 (1959)]

Finally it may be asked whether a trial such as is here projected may in any true sense be termed either a trial by jury or an exercise of the judicial process, as those concepts are generally understood.

I would vote to reverse the judgment of the Appellate Division and to reinstate the judgment of the trial court.

CLIFFORD, J., and Judge COLLESTER join in this dissenting opinion.

*For affirmance* — Chief Justice HUGHES, and Justices JACOBS, SULLIVAN and PASHMAN—4.

*For reversal*—Justices MOUNTAIN and CLIFFORD, and Judge COLLESTER—3.