Florence Christina AARNES, Plaintiff,

v.

MERCK & CO.; Sterling Drug, Inc.; Upjohn Co.; Robins Co.; Lederle Laboratories, a Division of American Cyanamid Co.; Parke-Davis Corp., A Division of Warner Lambert & Co.; E.R. Squibb & Sons, Inc., a Division of Squibb Corp.; Schering Corp., a Division of Schering-Plough Corp.; Organon Corp., a subsidiary of Akonza Corp.; Pfizer Pharmaceuticals, Inc., a subsidiary of Pfizer, Inc., Defendants.

Civ. No. 75–594.

United States District Court, D. New Jersey.

July 8, 1980.*

Clifford G. Frayne, Newark, N.J., for plaintiff.

James L. Melhuish, Livingston, N.J., for Pfizer, Inc.

Eugene M. Purcell, Pluckemin, N.J., for Parke-Davis & Co.

Mark M. Bridge, Mt. Holly, N.J., for A.H. Robins Co.

Lee A. Adlerstein, Newark, N.J., for E.R. Squibb & Sons, Inc.

Franklin C. Steinberg, Newark, N.J., for Merck & Co.

Mary B. Rogers, Jersey City, N.J., for Upjohn Co.

Roger L. Toner, Newark, N.J., for Schering Corp.

* Affirmed *sub. nom. King v. Merck & Co., et. als.*, 672 F.2d 903, citing *Namm v. Charles E. Frosst, Inc.*, 178 N.J.Super. 19, 427 A.2d 1121 (App.1981).

## MEMORANDUM

BIUNNO, District Judge.

In this diversity jurisdiction suit, the plaintiff, a citizen of Texas, originally sued 10 pharmaceutical manufacturers for alleged personal injury claimed to have been sustained as the result of manufacturing and marketing medications within a class generally labelled as "corticosteroids" indicated for the treatment of asthma, without adequate warnings that prolonged use would result in suppressing and atrophy of the normal activity of the adrenal glands, and in dependence on the medication as a consequence, as well as in adverse side effects.

The complaint asserts that for some 25 years before its filing in 1975 (i.e., over the period from about 1950), plaintiff had ingested such medications by way of treatment for asthma, while under the care of a number of different physicians, hospitals and the like, in Texas; that as a consequence had suffered atrophy of adrenal activity, had become dependent on the medication, and had suffered side effects. The complaint is silent on the question whether the alleged medication was effective in the treatment of the asthmatic condition, or on the question whether alternative medications of some other kind were in existence and available for effective treatment or whether, for the degree and nature of the ailment as it existed, the medications involved were the only ones capable of providing effective treatment despite their disadvantages.

As reference to any standard medical text will disclose, asthma is a condition which may be acute or chronic, or a combination of the two, in which the bronchi or air passages in the lungs become constricted, thereby reducing the ventilation of the highly divided inner surfaces of the lungs and as a consequence the expiration of carbon dioxide in exchange for oxygen from the air is reduced. The consequence, in effect, is a kind of partial asphyxiation which would tend to increase heart action and can lead to cardiac failure in severe cases.

Most of the defendants, in their answers, asserted special or separate defenses to the effect that the claim was grounded on the so-called "enterprise" theory, seeking to hold all the defendants liable as joint and several tortfeasors merely because they had manufactured and marketed medications of the general class which included whatever medications plaintiff had ingested, and without proof that the product of any one or more of the defendants had actually reached and had been ingested by plaintiff over the 25 year period or, if they had, for what part of the period.

At an earlier stage of the case and before discovery was complete, plaintiff moved to strike the defenses under F.R.Civ.P. 12(f), and defendant A.H. Robins Co. moved for summary judgment. After hearing on both motions Judge Whipple, by opinion dated September 11, 1976, denied both motions.

Following the completion of discovery, a pretrial order was entered by Magistrate Hunt in late 1979, in which provision was made for plaintiff to bring on a motion for summary judgment under F.R.Civ.P. 56 on the same issue previously advanced under Rule 12(f).

One defendant (Abbott Laboratories) had previously been taken out of the case on a voluntary dismissal. The remaining defendants are Merck, Schering, Organon, Squibb, Lederle and Pfizer (represented by the same attorneys), Parke-Davis, A.H. Robins, and Upjohn. All of the defendants, either by formal motion in writing or by oral joinder in the motions for the others, moved for summary judgment against plaintiff.

Both sets of motions were heard together, and the court called for supplemental documents, all of which have come in and have been thoroughly examined, along with the many briefs. The court concludes that plaintiff's motion must be denied, and the motions for defendants granted. The disposition so made is a complete disposition of the case even though other issues, such as the applicability of the statute of limitations and its potential extension by New

Jersey's discovery rule, were neither presented, argued nor decided. The ruling made goes to the core of the case, rendering all other issues moot and thus capable of supporting a final judgment in favor of all remaining defendants.

In the pretrial order, in the briefs, and in the discovery materials, plaintiff asserts that there is no proof available for trial to establish which product of which defendant was prescribed or administered by a particular hospital or physician at a given period of time. In response to interrogatories, plaintiff has provided the names of 30 physicians consulted during various periods, 14 being in Galveston, 2 in Houston, 1 in San Antonio, 2 in El Paso (all these being Texas), one in Sun City, Ariz., 1 in Phoenix, Ariz., 2 in Boston and 7 in Denver, Colo. A total of 16 hospitalization periods are listed (some being intermittent and quite a few overlapping in time), in Galveston, Houston and El Paso, Texas; Phoenix, Arizona; Boston, Mass; Denver, Colo; and the Mayo Clinic in Rochester, Minn. (no physicians are listed from Rochester). Finally, a total of 19 pharmacies are listed for various periods (some overlapping) in Galveston, Houston, El Paso, and Denver at which it is said that corticosteroids were purchased. However, plaintiff claimed inability to identify the specific medication prescribed, administered or purchased through any of these sources.

There is no dispute that all medications of the general class are lawfully obtainable only by prescription. They are not "over-the-counter" drugs. Plaintiff also says that the labels on each vial of medication did not specify the brand name with which it was filled, nor does she know what brand was prescribed and used during hospital treatment.

Two physicians who treated plaintiff have testified on deposition that plaintiff habitually overdosed herself by taking more of the medication at more frequent intervals than the instructions given called for, that this was true not only of asthma medications but of others as well, such as percodan, which contains oxycodone (a derivative of cocaine), which can be habit forming.

Thus, no reasonably reliable list of the various medications taken by plaintiff, whether they were corticosteroids or something else, was available.

She was described by one treating physician as a "drug abuser", who not only took more medication of all kinds than prescribed, but also admitted that her father had obtained corticosteroid medications for her on the "black market" at a time when they had not been cleared for use.

The materials submitted by defendants show that a large number of manufacturers, in excess of 100, have marketed corticosteroids at one time or another during the 25 year span. The additional submissions include a bulky item of reproductions of pages of a trade publication, as well as a printout from the FDA of manufacturers who obtained approved NDA's (New Drug Applications) for glucocorticosteroids from 1955 to date.

No jurisdiction has adopted the so-called "enterprise" theory. Under that theory, advanced by a student editor in 46 Fordham L.Rev. 963 (1978), the rider of a horse who was "thrown" due to a defective horseshoe, could sue and recover from all manufacturers of horseshoes if the defect was due to some industry standard, without showing the source of the defective shoe, so long as the manufacturers sued accounted for a high statistical percentage (say, 80% or more) of all horseshoes marketed.

New Jersey has not gone that far. The decision in *Anderson v. Somberg*, 67 N.J. 291, 338 A.2d 1 (1975) does allow a plaintiff to sue all parties in a causative chain, even though unable to show which defendant in the chain was at fault, and have the benefit of an instruction that the jury *must* find liability on the part of every defendant who fails, by the evidence, to exculpate himself by a preponderance.

But, the *Anderson* doctrine cannot be applied in any case where less than all of the potentially culpable defendants have been joined in the same case for trial together before the same jury.

In the context of the present case, *Anderson* could only apply if plaintiff could show that identified manufacturers' products had in fact been ingested at one time or another over the period, and had joined all of them, together with the physicians, hospitals and pharmacies in the chain, and that at least one of them had to be legally responsible for the claimed injury.

The present case does not begin to approach the *res ipsa* concept embodied by *Anderson*. That case involved a chain of activity from identified manufacturer of the rongeur, through distributor, to hospital and surgeon. The breaking off of the tip could intellectually be accepted as the fault of someone in the connected links of the chain, making it reasonable (as the Supreme Court saw it) to say that all defendants should be held liable except as one or another was able, by evidence, to exculpate.

The situation here is vastly different. It is shown, without contradiction, that there were more than 100 sources of various corticosteroids over the period. It was shown, without contradiction, that plaintiff was a drug abuser, not only as to corticosteroids but as to all other medications as well.

The drug abuse aspect, by itself, is sufficient to preclude any recovery on the *Anderson* or on the "enterprise" theories. Prescription medications are sold, not to the consumer but to pharmacies and hospitals, who are supposed to dispense only according to a physician's prescription. Even if plaintiff had not been a drug abuser, there is no suggestion in the pleadings or in the discovery that the physicians and hospitals had any choice but to prescribe a corticosteroid after diagnosis of plaintiff's individualized condition. The alternative may have been to prescribe some other medication that did not have the adverse consequences on a very long term basis that corticosteroids may have had, but that would have been ineffective for the treatment of the ailment.

The only discovery material provided by plaintiff on the medical aspects of the claim is a letter opinion of Dr. Vogelpohl, of Galveston, Texas, which nowhere suggests that there was any defect in the medications plaintiff had taken, and which nowhere suggests or implies that the many physicians who had treated her should have followed some different course of therapy. He recognizes that many physicians had tried to "taper off" the patient's use of steroids, but that this was possible only for very short periods after which a recurrence of acute attacks required resumption of their use, usually in larger doses temporarily.

Some of the defendants presented proof that no corticosteroid manufactured or marketed by them was indicated for the treatment of asthma. One had a product for treatment of arthritis, and plaintiff herself testified that she had never been prescribed medication for arthritis.

■ Not to be overlooked is New Jersey's requirement that in cases like this, where highly technical aspects dealing with biochemistry and medicine are involved, juries will not be allowed to speculate, and a plaintiff must have competent and qualified expert witnesses to provide the jury with understanding. See, e.g., *Walck v. Johns-Manville, etc.*, 56 N.J. 533, 267 A.2d 508 (1970); *Schueler v. Strelinger*, 43 N.J. 330, 204 A.2d 577 (1964); *Sanzari v. Rosenfeld*, 34 N.J. 128, 167 A.2d 625 (1961). Dr. Vogelpohl's letter opinion, which plaintiff says is all that can be presented by way of expert testimony, falls far short of this requirement.

■ Finally, it is noted that the fact materials presented by defendants are in no way denied or put in issue as matters of fact.

All in all, the case amounts to no more than a shotgun selection of a handful of manufacturers of the entire class of corticosteroids, without any evidence in hand that *any* manufacturer of the more than 100 can be faulted for their product which, from every indication, successfully treated plaintiff's asthmatic condition and which may well have done so *without* the adverse effects claimed had plaintiff not been a drug abuser.