274 N.J. Super. 447 (1994)
644 A.2d 647
STEPHEN MACIAG, EXECUTOR OF THE ESTATE OF CHARLOTTE MACIAG AND STEPHEN MACIAG, INDIVIDUALLY, PLAINTIFF-APPELLANT,
v.
STRATO MEDICAL CORP. AND DOW CORNING CORP., DEFENDANTS-RESPONDENTS, AND RICHARD ROE CORP., A FICTITIOUS NAME; GODFREY C. PINDER, M.D., ST. CLARE'S/RIVERSIDE MEDICAL CENTER, JANE DOE, A FICTITIOUS NAME, BARRY A. REITER, M.D., STEPHEN M. SCHREIBMAN, M.D., STEVAN ADLER, M.D., A PROFESSIONAL ASSOCIATION, AND BARRY A. REITER, M.D., STEPHEN M. SCHREIBMAN, M.D. AND STEVAN ADLER, M.D., INDIVIDUALLY, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 17, 1994.
Decided June 24, 1994.
*450 Before Judges DREIER, BROCHIN and KLEINER.
Arthur L. Raynes argued the cause for appellant (Wiley, Malehorn & Sirota, attorneys; Mr. Raynes, of counsel and on the brief, William J. Kemple, Jr., on the brief).
Kenneth R. Meyer argued the cause for respondent Strato Medical Corp. (Porzio, Bromberg & Newman, attorneys; Lauren E. Handler, of counsel and on the brief, Morna L. Sweeney and Vanessa M. Kelly, on the brief).
Richard J. Shackleton argued the cause for respondent Dow Corning Corporation (Shackleton, Hazeltine & Bishop, attorneys; Mr. Shackleton, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Plaintiff appeals from a partial summary judgment dismissing his product liability claims against Strato Medical Corp. and Dow Corning Corp., two of the several defendants in this case. He also appeals from the denial of his motions for reconsideration. Plaintiff's late wife, Charlotte Maciag, sustained injuries after a subclavian venous access catheter fragmented inside her.[1]
The defendants in this action are Strato Medical Corporation, manufacturer of the catheter, Dow Corning Corporation, manufacturer of the tubing incorporated into the catheter, Dr. Godfrey Pinder, the physician who surgically implanted the catheter, St. Clare's/Riverside Medical Center, the hospital in which the surgery implanting the catheter was performed, and Mrs. Maciag's *451 treating oncologists, Dr. Barry Reiter, Dr. Steven Schreibman and Dr. Stevan Adler, sued individually and collectively as a professional association.
Strato and Dow Corning successfully moved for summary judgment. On June 11, 1993, the day on which the motions for summary judgment were granted, plaintiff's attorney received 291 additional documents from Strato.[2] The documents were apparently provided by Strato in response to plaintiff's request for production of documents served approximately three years earlier. As a result of receiving the additional discovery, plaintiff moved on June 18, 1993 for reconsideration of his summary judgment motions. Subsequently, on June 25, 1993, Strato provided an additional 700 pages of discovery to plaintiff. On August 6, 1993, the trial court denied plaintiff's application for reconsideration without prejudice to his right to bring a future application "in the event that movant can set forth a specific claim that the additional materials ... in fact contain newly discovered evidence that could alter said judgment." On September 24, 1993, plaintiff unsuccessfully moved on the basis of a supplemental expert report to vacate the trial court's orders and reinstate all claims against Strato and Dow Corning. We granted leave to appeal and now reverse.
Plaintiff's decedent, Charlotte Maciag, was diagnosed with metastatic breast cancer for which a mastectomy was performed in 1986. On February 8, 1988, Mrs. Maciag underwent surgery for the implantation of a subclavian venous access catheter. The catheter was manufactured by Strato and contained two components: a circular stainless steel injection portal, and a segment of silicone catheter tubing, supplied by Dow Corning.
From February 1988 to September 1988, the catheter was used in the administration of chemotherapy to Mrs. Maciag. On September 9, 1988, x-rays revealed that the catheter tubing had fragmented into at least four pieces. Two surgeries were performed *452 to remove the catheter and retrieve the two larger pieces of the tubing. Smaller fragments of the tubing could not be removed and remained lodged in or near Mrs. Maciag's pulmonary artery until her death on October 4, 1989.
When the pieces of the catheter were removed, they were examined by the pathology department at St. Clare's and photographs of them were taken. Strato was then permitted to remove the catheter from the hospital for further examination and testing. Unfortunately, Strato has certified that it is now unable to locate the catheter.
Plaintiff provided the trial court with expert opinions concerning the liability of both the medical defendants and the product liability defendants. Plaintiff's medical liability expert, Barry L. Singer, M.D., principally concluded that the shattering of the "portacath" was caused in part by the failure of the inserting surgeon and the attending oncologist to require follow-up x-rays and to monitor the patient. In the expert's opinion, the failure of the medical personnel to monitor the catheter when chemotherapy was being administered through it was a deviation from accepted medical standards of care. In addition, he claimed that the delay in treatment as a result of the catheter problem worsened the patient's prognosis for survival.
We here focus, however, on the expert opinion of Gary B. Witman, M.D., plaintiff's expert concerning the product liability defendants. Dr. Witman furnished four reports which we will summarize: September 5, 1992, November 23, 1992, April 29, 1993 and September 10, 1993. His initial report described the procedure for the insertion of the device by the vascular surgeon. The expert noted that the surgeon had never used the device prior to this surgery, although he had used another vascular access device. When the broken catheter was removed from the chest cavity on September 9, 1988, all that was left was the access port connected to a 12.8 centimeter piece of white tubing.
A CT obtained on 10/6/88 revealed that fragments of the catheter had been left behind, and had showered the pulmonary vasculature. The largest of these *453 fragments was 8 mm. in size. They involved the superior segment of the left lower lobe, pulmonary artery branch, the left hilum, probably in the left pulmonary artery, the medial wall of the main pulmonary artery out flow tract, and the superior segment of the right lower lobe branch of the pulmonary artery.
Dr. Witman noted that the Journal of Clinical Oncology had documented a "pinch-off effect," when there was "long standing compression at the narrow space between the clavicle and the first rib." The expert stated, however, that "[t]his shower and fragmentation of the device tubing cannot be attributed in entirety to the `pinch-off effect' as reported in the medical literature.... [I]n this case, the tubing has shattered into multiple pieces, and this cannot be explained on the basis of a stress fracture phenomenon." In this initial report, Dr. Witman stated unequivocally that a failure of this kind would not occur in the absence of negligence. He further stated:
Due to the loss of the catheter by Strato, it is impossible for me to provide you with the exact cause of the failure of this device. The possible causes include problems with the design, problems inherent in the manufacturing or sterilization flaws, or negligent or improper placement or use of the catheter.
In Dr. Witman's second report, he reviewed the preparation, sterilization procedures, performance criteria and insertion technique concerning the device. He first repeated the conclusions of his earlier report, and then questioned whether the tubing selected for catheter attachment was appropriate, "as this particular type of tubing is not intended for long term or permanent implantation." Relying upon the surgeon's deposition stating that the pieces of catheter removed were not a consistent color, but had been discolored in an irregular manner to a yellowish color, Dr. Witman stated that the
irregular discoloration suggests that the tubing was deteriorating. Without analyzing the actual tubing (which Strato claims to have misplaced), it is difficult to definitively determine the cause of the deterioration. However, the deterioration noted by Dr. Pinder is consistent with deterioration resulting from the use of the chemotherapy drugs ... administered by [the oncologists].
Dr. Witman also noted that the oncologist's medical records failed to indicate proper flushing of the catheter after use. Also, the surgeons apparently had relied upon literature provided by a different manufacturer and may not have followed the Strato *454 instructions that a particular type and size needle be used, raising the possibility that the oncology staff "used an inappropriate needle and damaged the catheter." He again bemoaned the loss of the catheter, the examination of which could have revealed the cause of the problem.
Dr. Witman's third report concentrated on the actions of the surgeon, noting that Dr. Pinder attempted to comply with recommended guidelines in the insertion of the catheter and verification of its location. However, he noted that the device had been placed in the medial aspect of the subclavian vein, thus giving rise to the pinch-off effect which occurs in approximately one percent of patients utilizing a central venous line. According to Dr. Witman, the Food and Drug Administration in its approval for "Strato's Life Port Access System had recommended that the device be placed in the lateral aspect of the subclavian vein. In this way the catheter will not be compressed up against the medial wall and will be free to roam without experiencing `pinch-off.'" The portacath system with which the surgeon had been familiar prior to this operation was different from the life port system, and each had "unique and distinct approvals and guidelines." Dr. Witman concluded that pinch-off could explain the breaking of one piece of tubing, but was unable to explain the shattering of the catheter into multiple pieces which must, in his opinion, be attributed to negligence in design or manufacturing.
Following the belated delivery of the supplemental discovery material from Strato's attorneys, Dr. Witman provided a more comprehensive report concerning the structural problems in the catheter. He commenced by stating that "it is likely that structural defects in the Lifeport Catheter Device, manufactured by Strato Medical Corporation ... led to stress fragmentation of the attached catheter." The newly discovered material identified comparable problems known to Strato since 1986. Indeed, the injury to the decedent was not unique as a variant of the injury had been identified during clinical trials. The report explains the physical testing of the Dow Corning tubing and the clinical trials *455 at Boston area hospitals. After the initial report of a broken tube, both Strato and Dow Corning performed further testing to determine whether the break was due to mechanical trauma on removing the catheter or a physical problem with the catheter. Dow Corning specifically informed Strato as follows:
Dow Corning does not make recommendations on specific drug compatibility. Suggest testing each drug for effects on tubing. Halogenated materials in general should be carefully checked.
Dr. Witman noted that the most common drug in the management of metastatic breast cancer is a halogenated fluropyrimidine compound. Thus the integrity of the catheter could potentially be compromised by the very drug that decedent had been receiving.
Even after the additional documentary material had been supplied, Dr. Witman found it impossible to provide plaintiff with the exact cause of the failure of the device. He again stated as he did in his initial report that "probable causes include problems with the design, problems inherent in the manufacturing or sterilization flaws, or negligent or improper placement or use of the catheter." He reiterated that the "pinch-off" effect could not fully explain the problem due to the fragmentation of the device. His final conclusion was that
the injury, the shattering of the catheter into multiple pieces with lodging in the pulmonary vasculature, is due specifically to a defect in either product design, product manufacture, or improper product implantation. It is not probable that any other cause can explain these events. The sterilization process was appropriate and should not cause the breakdown of silica material.
Rule 4:46-2 permits a summary judgment only if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." See also Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74, 110 A.2d 24 (1954). In granting the summary judgment, the trial court mistakenly analyzed the alternative liability theory articulated in Anderson v. Somberg, 67 N.J. 291, 338 A.2d 1, cert. denied, 423 U.S. 929, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975). The judge determined that plaintiff's damages may have been caused by *456 "pinch-off," a compression of the catheter between the clavicle and the first rib which weakens the structural integrity of the catheter and permits it to shear. This, the judge found, was a recognized complication of the subclavian catheter. He overlooked Dr. Witman's conclusions that the shattering in this case went beyond a "pinch-off" shear of the catheter. The judge determined that the cause of the damages suffered by decedent, and through her the plaintiff, fell only within the ambit of those directly associated with the surgical procedure, and as such were merely malpractice claims which were not encompassed by the Anderson ruling. The judge stated that when a risk that was warned against occurs the resulting injury does not bring the plaintiff within the Anderson v. Somberg ruling, and plaintiff's expert was required to demonstrate that common medical knowledge would indicate that the shattering of the tube
is not a normal consequence of this surgical procedure, and it lies outside the ambit of the procedure. And that it may have occurred by trauma at the time of the insertion or subsequently, and if that did not occur then it had to be caused by a manufacturing defect or other cause presently unknown to the medical community. That it's not something within the ambit of the surgical procedure.
This is too narrow a reading of Anderson.
Anderson was and is a landmark case in its shifting of the burden of producing evidence in a case having varying theories of recovery. Justice Pashman's plurality opinion only expresses the views of three justices.[3] The decision actually did nothing more than affirm the Appellate Division decision, 134 N.J. Super. 1, 5-6, 338 A.2d 35 (App.Div. 1973), that the burden of coming forward with evidence should shift to the defendants based on the principles described by the Supreme Court in NOPCO Chem. Div. v. Blaw-Knox Co., 59 N.J. 274, 282-283, 281 A.2d 793 (1971). Justice Pashman viewed the factual setting in Anderson as warranting the collective imposition of a res ipsa loquitur theory to the *457 group of defendants potentially responsible for Mr. Anderson's damages.
In Anderson, during the course of surgery for the removal of an intervertebral disc in the lumbar spine of the anesthetized plaintiff the tip of a metal pituitary rongeur broke off and fell into the surgical cavity. The surgeon could not readily remove the tip at the time, and a new operation was necessary to accomplish this removal. Possible responsible parties included the surgeon, the hospital or its operating room personnel, and the manufacturer or distributor of the instrument. They were all parties to the law suit, and each could come forward and state that either he or it had done no wrong or supplied no defective product. Plaintiff's expert could state no more than that the surgical instrument should not have broken, and that one or more of the defendants had either been negligent or supplied a defective product.
The case before us does not differ appreciably from Anderson v. Somberg. The principal potential defendants are all before the court. The manufacturer of the broken tube, the manufacturer of the completed product, the hospital (which most probably purchased the product, although we are not told whether the product had been supplied by the hospital, the surgeon, or the oncologists; but all are parties), the surgeon who implanted the catheter, and the oncologists who utilized the catheter for the next several months. Absent as defendants are the surgical nurses and oncology nurses who may have handled the product, but as their employers, the hospital and oncologists, are both parties, any negligence on their part would be attributed to their respective principals.[4] Also absent from this case is any distributor of the product in the event it had not been sold directly from Strato to the hospital. However, there has been no allegation that the *458 catheter had been physically damaged before it was inserted into the patient. We therefore do not suffer from the infirmities found by this court in Johnson v. Mountainside Hosp., 239 N.J. Super. 312, 571 A.2d 318 (App.Div.), certif. denied, 122 N.J. 188, 584 A.2d 248 (1990). There the proofs "did not provide a sufficient basis for the jury to have found that the failure was caused by the negligence of at least one among [the] defendants...." Id. at 327, 571 A.2d 318. Nor, according to plaintiffs expert is this a case where the type of injury suffered by plaintiffs decedent was a reasonably foreseeable risk of the procedure. See Anderson v. Somberg, supra, 67 N.J. at 302, 338 A.2d 1; Blitz v. Hutchinson, 252 N.J. Super. 580, 588-589, 600 A.2d 485 (App.Div. 1991).
This case is somewhat dissimilar to Anderson in its time frame. In Anderson, while the distribution of the allegedly defective product may have preceded the incident, the alleged negligence of the various individual defendants converged at the time the forceps broke. In the case before us, the design and manufacture of the product again preceded the incident, but the possible negligence of the various medical personnel ranged from the time the catheter was inserted possibly too close to the clavicle, through the months that the catheter was used and allegedly not flushed or possibly was nicked by a needle. We do not consider these differences to be material. Here, as in Anderson, the patient is both blameless and without the ability to judge the conduct of the various defendants. Also, as in Anderson, the presence of another culpable defendant is unlikely.
As in Anderson, it is possible that two or more of the defendants might be liable. (There, for example, might have been a manufacturing defect in the rongeur, the hospital may have permitted over-use of the instrument, and the physician may have exerted too much pressure, causing it to break.[5]) In the case *459 before us, it is possible (a) that inappropriate material was supplied by Dow Corning with knowledge of how the catheter would be used; (b) that the catheter had a manufacturing, design or warning defect; (c) that the surgeon inserted the catheter too close to the collarbone with or without participation by the operating room nurses, (d) that the oncologists and oncology nurses failed to flush out the catheter properly, causing it to deteriorate, (e) that one or more of the physicians or nurses may have nicked the catheter with a needle when administering medication, and (f) that there was deficient monitoring of the state of the catheter in decedent's body. There are other marginal claims, but proof concerning these claims, singly or in combination, should be forthcoming from defendants. At the very least, Anderson v. Somberg shifts the burden to defendants to come forward with exculpatory evidence. 134 N.J. Super. at 5-6, 338 A.2d 35; accord, NOPCO Chem. Div. v. Blaw-Knox Co., supra, 59 N.J. at 282-283, 281 A.2d 793.
The shifting of this burden of coming forward with evidence is not the shifting of the burden of proof that was urged by the Supreme Court plurality in Anderson, 67 N.J. at 300-303, 338 A.2d 1. The attempt of the plurality to shift the burden of persuasion caused the Court in a later opinion to limit such an "alternative liability" approach "to one factual context." Shackil v. Lederle Labs., 116 N.J. 155, 173, 561 A.2d 511 (1989). Yet even the shifting of the burden of coming forward with evidence substantially affects the summary judgment procedure. The plurality opinion states that "[i]n cases of this type, no defendant will be entitled to prevail on a motion for judgment until all the proofs have been presented to the court and jury." 67 N.J. at 303, 338 A.2d 1. This makes eminent good sense. If each defendant has the burden of presenting exculpatory evidence, until all of this evidence has been evaluated by the jury, no defendant should be able to be exonerated before trial. The shifting in the burden of coming forward with evidence to the group of defendants requires that they all be present to offer such evidence to the jury.
*460 Even if we limit Anderson v. Somberg to the principles of its holding, we still have what in effect is a collective application of res ipsa loquitur to all of the defendants. As stated in Kahalili v. Rosecliff Realty, Inc., 26 N.J. 595, 606, 141 A.2d 301 (1958), res ipsa loquitur permits
an allowable inference of the defendant's want of due care where (a) the occurrence itself ordinarily bespeaks negligence; (b) the instrumentality was within the defendant's exclusive control; and (c) there is no indication in the circumstances that the injury was the result of plaintiff's own voluntary act or neglect. The rule has its foundation in probability and the procedural policy of placing the onus of producing evidence upon the party who is possessed of superior knowledge or opportunity for explanation of the causative circumstances.
What is required is explanation, not exculpation. Ibid. A plaintiff "`need not exclude all other persons who might possibly have been responsible where the defendant's negligence appears to be the more probable explanation of the accident.'" Bornstein v. Metropolitan Bottling Co., Inc., 26 N.J. 263, 273, 139 A.2d 404 (1958) (quoting Zentz v. Coca-Cola Bottling Co. of Fresno, 39 Cal.2d 436, 247 P.2d 344 (1952)). Res ipsa loquitur supplies an inference of negligence, requiring the defendant to come forward and rebut it. It shifts the burden of coming forward with the evidence.
Res ipsa loquitur can be applied against more than one defendant, and in fact upon multiple theories against different defendants. See Meny v. Carlson, 6 N.J. 82, 94, 77 A.2d 245 (1950) (joint control of scaffolding); Smith v. Claude Neon Lights, Inc., 110 N.J.L. 326, 331, 164 A. 423 (E. & A. 1932) (owner of building and owner and installer of sign that fell); Allendorf v. Kaiserman Enters., 266 N.J. Super. 662, 669, 630 A.2d 402 (App. Div. 1993) (owner of building and company maintaining elevator); cf. Van Winkle v. American Steam Boiler Co., 52 N.J.L. 240, 246, 19 A. 472 (Sup.Ct. 1890). In Jakubowski v. Minnesota Mining & Mfg., 42 N.J. 177, 183, 199 A.2d 826 (1964), the Court stated that even if an instrumentality has left the control of the defendant prior to an accident, "the plaintiff may be permitted to invoke the doctrine [of res ipsa loquitur] if he introduces evidences that it was not improperly handled by himself or others, or its condition *461 otherwise changed, after control was relinquished by the defendant."
These principles can be extrapolated to the case before us. If we view the claim of plaintiff in our case against each of the defendants, accepting for the moment the exculpatory claims of each of the other defendants, each defendant in turn could be subject to plaintiff's res ipsa loquitur claim. Since plaintiff's decedent could not be responsible, and one of the defendants most probably was responsible, each defendant's proof of innocence becomes, in effect, proof of responsibility on the part of those remaining. The integration of these proofs is the foundation for the court to apply the doctrine of res ipsa loquitur collectively against all of the defendants.
The best example of an application of this approach is the fifty-year-old case of Ybarra v. Spangard, 25 Cal.2d 486, 154 P.2d 687 (1944), the doctrinal predecessor of the California cases cited in Anderson v. Somberg, 67 N.J. at 301, 338 A.2d 1. Here, the plaintiff's shoulder was injured while he underwent an appendectomy. The defendants were various physicians, surgeons, nurses and the hospital. The Court stated:
It may appear at the trial that, consistent with the principles outlined above, one or more defendants will be found liable and others absolved, but this should not preclude the application of the rule of res ipsa loquitur. The control at one time or another, of one or more of the various agencies or instrumentalities which might have harmed the plaintiff was in the hands of every defendant or of his employees or temporary servants. This, we think, places upon them the burden of initial explanation. Plaintiff was rendered unconscious for the purpose of undergoing surgical treatment by the defendants; it is manifestly unreasonable for them to insist that he identify any one of them as the person who did the alleged negligent act.
The other aspect of the case which defendants so strongly emphasize is that plaintiff has not identified the instrumentality any more than he has the particular guilty defendant. Here, again, there is a misconception which, if carried to the extreme for which defendants contend, would unreasonably limit the application of the res ipsa loquitur rule. It should be enough that the plaintiff can show an injury resulting from an external force applied while he lay unconscious in the hospital; this is as clear a case of identification of the instrumentality as the plaintiff may ever be able to make.

*462 [154 P.2d at 690-691].
Only in the exceptional case where the jurors' minds are left in balance concerning whether any of the defendants was negligent or any product was defective would the shift in the burden of persuasion as well as the burden of proof make a difference. Such cases are few; but if after hearing the exculpatory evidence from all of the defendants the jurors are convinced that no defendant is liable, then, unless the burden of proof is shifted, plaintiff will not prevail.[6] But if the jurors themselves determine that at least one of the defendants must be liable and certain of the defendants have clearly exculpated themselves, then this exculpation can lead the jury to an inference that one or more of the remaining defendants is liable. Thus, we need not here accept the Anderson plurality's shift in the burden of persuasion; that step requires a decision which might better be left to the Supreme Court or to a different case. We here need to apply merely the shift in the burden of producing evidence, supported by a legion of New Jersey cases where the information is more readily available to the defendant.[7]
We therefore determine that all of the potential defendants in the case before us should remain before the court until the jury has had an opportunity to evaluate their respective exculpatory *463 proofs. Anderson v. Somberg, 67 N.J. at 302, 338 A.2d 1. Were the rule otherwise, and each defendant were to be heard independently, each in turn would have its motion for summary judgment granted in a case where one of the multiple defendants is surely liable, but the plaintiff cannot now prove which one.
A final aspect of this case which must be commented upon was the action of Strato's attorneys who had provided incomplete documentary discovery prior to the initial summary judgment motion. As we noted earlier, on the very day the summary judgment motion was decided against plaintiff, plaintiff's attorneys received hundreds of documents bearing upon the case, belatedly delivered years following the documentary demand. Then, presumably because Strato's attorneys had learned that they had prevailed on the motion, someone from the attorney's office called plaintiff's attorney and requested the immediate return of the documents, claiming that they had been transmitted in error. The importance of the documents, however, had already been discerned by plaintiff's attorneys, and the demand for their return was rejected. In fact, hundreds more documents were later delivered, and they fleshed out some of Dr. Witman's conclusions. The late delivery of this documentary discovery and the irresponsible demand for its return warrant an appropriate discovery sanction that should be imposed by the trial judge on remand. The trial judge shall further consider the circumstances of the loss of the catheter, and determine whether in the aggregate further discovery sanctions are warranted under Viviano v. CBS, Inc., 251 N.J. Super. 113, 597 A.2d 543, certif. denied, 127 N.J. 565, 606 A.2d 375 (1992), and Hirsch v. General Motors Corp., 266 N.J. Super. 222, 236-237, 628 A.2d 1108 (Law Div. 1993). The trial judge shall determine the nature and extent of the sanctions, and specifically may determine whether the jury should be authorized to draw inferences adverse to Strato based upon its conduct.
The summary judgments in favor of Strato and Dow Corning are reversed, and the matter is remanded to the Law Division for further proceedings in accordance with this opinion.
NOTES
[1] Plaintiffs Charlotte Maciag and Stephen Maciag commenced this medical malpractice and products liability action on April 7, 1989. Mrs. Maciag died on October 4, 1989, and her husband, plaintiff Stephen Maciag, as executor of his wife's estate, was substituted as plaintiff.
[2] We discuss infra the attempt by Strato's attorneys to have the documents returned without examination by plaintiff's counsel.
[3] The plurality opinion in the Supreme Court built upon Judge Seidman's concurring opinion in the Appellate Division. See 134 N.J. Super. at 6, 338 A.2d 35.
[4] It is true that if the hospital is rendered liable on the basis of the actions of the surgical nurses, and they have not been named separately as parties, damages will be limited to $250,000 under N.J.S.A. 2A:53A-8. This damage limitation, however, does not affect the liability determination.
[5] On retrial, there was evidence of a fault line in the metallic structure and the manufacturer and the distributer were held liable. See 158 N.J. Super. 384, 386 A.2d 413 (App.Div.), certif. denied, 77 N.J. 509, 391 A.2d 522 (1978).
[6] As we noted earlier, the plurality in Anderson v. Somberg shifted not only the burden of coming forward with evidence, but also the burden of persuasion. Over a vigorous dissent, the plurality suggests that under a theory of collective res ipsa loquitur, if one among the group of defendants must be liable, the jury should be told that it should return a verdict against one of the defendants. The dissent objected, stating that the jurors had taken an oath to determine the case on the basis of the evidence before it, and if the evidence exculpated each defendant, then the jurors could not return a verdict against one of them. The easy answer to this dilemma would be that such a jury would report to the judge that it could not reach a decision, and a new trial would be held. The jurors therefore would not be asked to violate their oaths.
[7] See cases collected in Biunno, Current N.J. Rules of Evidence, comment on N.J.R.E. 101(b)(2) at 93-96 (1993-94). See also cases in Feldman v. Lederle Labs., 97 N.J. 429, 456, 479 A.2d 374 (1984).