711 A.2d 352 (1998)
312 N.J. Super. 81
The ESTATE OF Angelina A. CHIN by Robert CHIN as Administrator and Administrator Ad Prosequendum of the Estate of Angelina A. Chin, and Robert Chin, individually, Plaintiffs-Respondents,
v.
ST. BARNABAS MEDICAL CENTER, Immacula Louis-Charles, Teresa Leib, and Nancy Hofgesang, Defendants-Respondents, and
Dr. Herbert Goldfarb, Defendant-Appellant, and
C.R. Bard, Inc., Defendant.
Superior Court of New Jersey, Appellate Division.
Argued April 22, 1998.
Decided May 27, 1998.
*353 Melvin Greenberg, Newark, for defendant-appellant (Greenberg, Dauber & Epstein, attorneys; Mr. Greenberg and Jeffrey Berkowitz, on the brief).
Harold A. Sherman, Edison, for plaintiff-respondent Estate of Angelina A. Chin *354 (George W. Conk, South Orange, of counsel and on the brief).
George J. Kenny, Roseland, for defendants-respondents St. Barnabas Medical Center, Immacula Louis-Charles, Teresa Leib and Nancy Hofgesang (Connell, Foley & Geiser, attorneys; Mr. Kenny, of counsel; Ernest W. Schoellkopff, on the brief).
Before Judges D'ANNUNZIO, RODRIGUEZ and COBURN.
The opinion of the court was delivered by
D'ANNUNZIO, J.A.D.
This claim arises out of the tragic and avoidable death of Angelina Chin during a hysteroscopy, a diagnostic procedure in which death is not an anticipated risk. The trial court submitted the case to the jury under the principles announced in Anderson v. Somberg, 67 N.J. 291, 338 A.2d 1, cert. denied, 423 U.S. 929, 96 S.Ct. 279, 46 L. Ed.2d 258 (1975). The jury awarded two million dollars in damages and apportioned liability as follows: twenty percent to Dr. Goldfarb; twenty percent to nurse Leib; twenty-five percent to nurse Hofgesang; thirty-five percent to St. Barnabas Medical Center; and zero percent to nurse Charles. The trial court had granted defendant C.R. Bard, Inc.'s motion for judgment at the close of the evidence.
After the jury announced its verdict, the court granted the motion of the hospital and the nurses for judgment notwithstanding the verdict. R. 4:40-2(b). The court entered judgment against Dr. Goldfarb alone for the entire amount of two million dollars plus interest. Dr. Goldfarb appeals. There are no cross-appeals. No one challenges plaintiff's right to judgment or to the two million dollar damages award. The only dispute is between the hospital and the nurses on the one hand, hereinafter sometimes referred to as the hospital defendants, and defendant Goldfarb.
A hysteroscopy is a diagnostic procedure whereby the uterus is observed utilizing a scope, a wand-like instrument with a television lens at its functioning end. The uterus can then be visualized on a television monitor. The physician's view is enhanced by stretching the uterus. This is achieved with the flow of fluid into the uterus. The flow can be by gravity or by the use of a pump which introduces the fluid into the uterus under pressure.
In the present case, the procedure was performed using a Bard Hystero-Flo Pump, a device manufactured by defendant C.R. Bard, Inc. The device consists of several tubes and a pump. Two of the tubes, located at one end of the device, are inserted into bags of fluid suspended from an IV pole. Fluid flows from the bags through the tubes to a point where they connect at what is called a Y-adaptor. Below the Y-adaptor is a diaphragm pump. A single tube leads from the pump, bringing fluid to the scope and then into the uterus.
The pump is energized by gas. In this case, defendants used a supply of nitrogen gas located in the ceiling of the operating room. The gas flows from its source to a regulator and from the regulator the gas moves through a tube, the gas line, to the diaphragm pump. Gas that has powered the pump then flows out of the system through an open exhaust line into the atmosphere.
As previously indicated, the scope has a lens on its functioning end. There are two ports in the wall of the scope upstream from the functioning end. One port is the inflow port, i.e., it is connected to the line carrying fluid from the diaphragm pump. The fluid, under pressure, enters the uterus through a fitting on the end of the scope. The second port is the outflow port. Excess fluid is evacuated from the uterus through suction tubing attached to the outflow port.[1] Sometimes gravity is used to evacuate the fluid, and the excess fluid flows through the suction tubing into a pail. On other occasions, a suction canister is used to facilitate evacuation.
In the present case, gas entered through Angelina Chin's body cavity and into her *355 circulatory system. Air bubbles formed in her blood vessels and killed her almost immediately. All parties accept the theory that the exhaust line was the source of the gas which killed Mrs. Chin.
The evidence established that the exhaust line, when it comes from the manufacturer, is clipped to the gas line, i.e., the line that carries gas from the regulator to the diaphragm pump. The exhaust line begins at the diaphragm pump, and it is forty-five inches long. Three clips hold the exhaust line to the gas line and the last clip is within an inch of the outflow end of the exhaust line. The evidence established that the exhaust line was properly clipped when it left the manufacturer, but the last clip was not on the apparatus when it was used in the Chin procedure. The absence of the last clip caused twenty-seven inches of the exhaust line to hang loose. The theory is that in its loose state the exhaust line could have been mistaken for a suction line. A jury could conclude that one of the nurses removed the clip or caused it to come off the line. There is evidence from which a jury could conclude that Dr. Goldfarb attached the loose exhaust line to the outflow port, although Dr. Goldfarb denied that he did so. There is evidence from which a jury could conclude that one or more of the nurses assisting in the procedure unclipped the exhaust line and made it possible for that line to be within the operative field, thereby facilitating its erroneous connection to the outflow port. There is also evidence to support a finding that one of the nurses connected the loose exhaust line to a suction canister which may have been connected to the scope through suction tubing.
The evidence established that the two nurses the hospital assigned to assist in the procedure, nurse Charles and nurse Leib, had no experience regarding the use of the Bard apparatus and had not attended hospital training sessions regarding its use. The evidence established that the supervising nurse who made the assignments was unaware of the experience or lack thereof of nurses Charles and Leib regarding this equipment. The evidence also established that, because of their inexperience, Charles or Leib asked nurse Hofgesang to assist them. During the procedure, Hofgesang, located to the patient's left, received the apparatus from Charles, the scrub or sterile nurse, who was located on the patient's right. Charles had removed the equipment from the Bard package, which Leib had opened, and handed the apparatus to Hofgesang who connected the tubes to the fluid bags and also connected the hospital's gas line to the regulator.
As previously indicated, the trial court ruled that this case is governed by the principles of Anderson v. Somberg, supra, and we begin our analysis with a discussion of it. Anderson arose out of back surgery performed by defendant, Dr. Somberg. During the procedure the tip of an instrument, an angulated pituitary rongeur, broke off in Anderson's spinal canal and lodged in his spine. 67 N.J. at 294, 338 A.2d 1. He sued Dr. Somberg, the hospital, the manufacturer of the rongeur and the rongeur's distributer. Id. at 295, 338 A.2d 1.
A jury returned a verdict of no cause as to each defendant. The Appellate Division reversed, on the ground that the trial court's instruction to the jury was inadequate. Anderson v. Somberg, 134 N.J.Super. 1, 5, 338 A.2d 35 (App.Div.1973). The majority opinion stated:
Reason and common sense dictate that the jury additionally should be charged that under the peculiar circumstances of this case the occurrence itself indicates liability on the part of one or more of the defendants, and that the burden should be shifted to defendants as they are most likely to possess knowledge of the cause of the accident. Each defendant has the duty to come forward with explanatory evidence. Nopco Chemical Div. v. Blaw-Knox Co., 59 N.J. 274, 282-283, 281 A.2d 793 (1971). Cf. Magner v. Beth Israel Hospital, 120 N.J.Super. 529, 534, 295 A.2d 363 (App.Div.1972).
For the reasons expressed the matter is reversed and remanded for a new trial as to all defendants.

[Id. at 5-6, 338 A.2d 35.]
Judge Seidman concurred in the reversal and remand for a new trial on the ground that the jury instruction "was so structured *356 that they may well have been misled or confused thereby." Id. at 6, 338 A.2d 35 (Seidman, J., concurring). Judge Seidman disagreed with the majority's ruling that the jury should be instructed that the circumstances established liability on one or more defendants. Ibid. In his view, the circumstances supported an inference of negligence which protected plaintiff from dismissal at the conclusion of plaintiff's proofs. Id. at 7, 338 A.2d 35. He would have shifted "the burden ... to each defendant to come forward with proof," id. at 8, 338 A.2d 35, leaving it to the jury "to determine whether in the final analysis the inference of fault outweighs the explanation." Ibid.
The Supreme Court affirmed in a four to three vote. Of the four voting to affirm, Justice Jacobs wrote no separate opinion "but vote[d] to affirm on the majority opinion rendered in the Appellate Division." Anderson, supra, 67 N.J. at 305, 338 A.2d 1.
In affirming the Appellate Division, Justice Pashman, writing for the plurality, stated:
The position adopted by the Appellate Division majority seems to us substantially correct; that is, at the close of all the evidence, it was apparent that at least one of the defendants was liable for plaintiff's injury, because no alternative theory of liability was within reasonable contemplation. Since defendants had engaged in conduct which activated legal obligations by each of them to plaintiff, the jury should have been instructed that the failure of any defendant to prove his nonculpability would trigger liability; and further, that since at least one of the defendants could not sustain his burden of proof, at least one would be liable. A no cause of action verdict against all primary and third-party defendants will be unacceptable and would work a miscarriage of justice sufficient to require a new trial. R. 2:10-1.
In the ordinary case, the law will not assist an innocent plaintiff at the expense of an innocent defendant. However, in the type of case we consider here, where an unconscious or helpless patient suffers an admitted mishap not reasonably foreseeable and unrelated to the scope of the surgery (such as cases where foreign objects are left in the body of a patient), those who had custody of the patient, and who owed him a duty of care as to medical treatment, or not to furnish a defective instrument for use in such treatment can be called to account for their default. They must prove their nonculpability, or else risk liability for the injuries suffered.

[Id. at 298, 338 A.2d 1 (emphasis added).]
The plurality explained that the actual burden of proof shifted to defendant, not merely the burden of going forward. Id. at 300, 338 A.2d 1.
We have engaged in this lengthy examination of Anderson because a recent Appellate Division opinion has suggested that Anderson does not result in a shifting of the burden of persuasion to defendants, but merely the burden of going forward. Maciag v. Strato Medical Corp., 274 N.J.Super. 447, 459, 644 A.2d 647 (App.Div.1994). We disagree with the Maciag court's analysis of Anderson.
Maciag states, erroneously, that the "plurality opinion of the Supreme Court built upon Judge Seidman's concurring opinion in the Appellate Division." Maciag, supra, 274 N.J.Super. at 456 n. 3, 644 A.2d 647. Not so. As previously indicated, under Judge Seidman's analysis, a plaintiff could lose. Under the majority opinion in the Appellate Division, and the Supreme Court's plurality opinion, plaintiff could not lose. Judge Seidman expressly recognized this difference when he observed that the jury instruction crafted by the majority "in effect, instructs the jury that someone is liable and mandates that they return a verdict in favor of the plaintiff and against one or more of the defendants." Anderson, supra, 134 N.J.Super. at 6, 338 A.2d 35.
Maciag states that because the Supreme Court's opinion was only a plurality, "[t]he decision actually did nothing more than affirm the Appellate Division decision that the burden of coming forward with evidence should shift to the defendants based on the principles described by the Supreme Court in Nopco Chem. Div. v. Blaw-Knox Co." 274 *357 N.J.Super. at 456, 644 A.2d 647 (citations omitted). Accepting the premise that the plurality opinion in effect "did nothing more than affirm the Appellate Division," ibid., the Appellate Division majority, as we have demonstrated, held that plaintiff could not lose, i.e., plaintiff was entitled to a liability verdict and the jury was to be so instructed. Anderson, supra, 134 N.J.Super. at 5-6, 338 A.2d 35. Under Maciag`s analysis, a plaintiff in an Anderson-type case could lose. Maciag, supra, 274 N.J.Super. at 462, 644 A.2d 647. That is not what the Appellate Division majority held in Anderson. The point is, if the plaintiff cannot lose, then the burden of persuasion must shift to each defendant, vis-a-vis the other defendants, to exculpate himself or herself.
The Supreme Court has not repudiated the Anderson principle that, in cases to which it applies, plaintiff is entitled to a judgment and the burden of persuasion shifts to the defendants. The Court had an opportunity to repudiate our reading of Anderson in Shackil v. Lederle Labs., 116 N.J. 155, 561 A.2d 511 (1989), in which it rejected a theory of market-share liability in pharmaceutical product liability cases. The Court, noting that Anderson shifted the burden of persuasion, limited Anderson "to one factual context." Id. at 173, 561 A.2d 511. In a dissenting opinion, Justice O'Hern, in support of a market-share theory of liability, observed that the "Anderson judgment has stood the test of time. When one of multiple tortfeasors has most probably caused plaintiff's injury, the law does not permit those tortfeasors to exonerate themselves by insisting that the plaintiff's inability to prove which of them caused the injury is a total bar in law to recovery." Id. at 199-200, 561 A.2d 511 (O'Hern, J., dissenting).
Additionally, many appellate opinions have discussed Anderson, understood it to shift the burden of persuasion in cases to which it applied, and have not suggested the revisionist evaluation of Anderson contained in Maciag. See Blitz v. Hutchinson, 252 N.J.Super. 580, 588-89, 600 A.2d 485 (App.Div. 1991); Wagner v. Deborah Heart & Lung Ctr., 247 N.J.Super. 72, 78-79, 588 A.2d 860 (App.Div.1991); Sholtis v. American Cyanamid Co., 238 N.J.Super. 8, 21, 568 A.2d 1196 (App.Div.1989); Namm v. Charles E. Frosst & Co., 178 N.J.Super. 19, 30-31, 427 A.2d 1121 (App.Div.1981); Maslonka v. Hermann, 173 N.J.Super. 566, 573, 575-76, 414 A.2d 1350 (App.Div.1980), rev'd on dissent, 85 N.J. 533, 428 A.2d 504 (1981); see also Huddell v. Levin, 537 F.2d 726, 746 (3d Cir.1976)(Rosenn, J., concurring).
We conclude that Anderson applies to the present case; plaintiff's decedent was a blameless, helpless, anesthetized victim of an event that was not reasonably foreseeable or anticipated and that would not have occurred in the absence of wrongdoing by one or more of these defendants. Each defendant, therefore, had the burden of persuading the jury that, as compared with the other defendants, he or she was blameless. With one exception, the parties acquiesced in trying this case as an Anderson case and in the shifting of the burden of persuasion.
The hospital defendants contended below, and contend on appeal, that once the trial court granted judgment to Bard, Anderson no longer applied. We disagree. Initially, the court denied Bard's motion for judgment made at the close of its codefendants' evidence. Bard then presented the testimony of its quality assurance manager and a consulting engineer. Thereafter, Bard renewed its motion, which the court granted. No party has appealed from the judgment in favor of Bard, and we conclude that the trial court correctly granted the motion. The apparatus did not malfunction or break, and there was no expert evidence to establish a design defect. The parties conceded that all three clips attaching the exhaust line to the gas line were in place when the apparatus left the manufacturer. The trial court, in essence, determined correctly that Bard had carried its burden of persuasion regarding its non-culpability. Anderson contemplated such an eventuality. Anderson, supra, 67 N.J. at 303, 338 A.2d 1.
As previously indicated, the trial court granted judgment to the hospital defendants notwithstanding the jury's verdict. In so ruling, the court stated:

*358 I'm granting that motion. I find there was no basis for the jury to return a, to even go to the jury as to the nurses. I believe I was in error in giving them the standard to use their common knowledge. There was no basis for that, for them to have common knowledge as to what goes on in the, in the hospital setting under the circumstances of this case.
In deciding a motion for judgment notwithstanding the verdict under R. 4:40-2(b) in a typical case, the trial court "`must accept as true all the evidence which supports the position of the party defending against the motion and must accord him the benefit of all legitimate inferences which can be deduced therefrom, and if reasonable minds could differ, the motion must be denied.'" Lanzet v. Greenberg, 126 N.J. 168, 174, 594 A.2d 1309 (1991) (citation omitted); Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969). The judicial function is "quite a mechanical one" as the trial court is "not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Dolson, supra, 55 N.J. at 5, 258 A.2d 706.
Thus, a reviewing court should not disturb a trial court's denial of the motion if the evidence, along with all legitimate inferences therefrom, could uphold a judgment in favor of the non-moving party. Lanzet, supra, 126 N.J. at 174, 594 A.2d 1309; Dolson, supra, 55 N.J. at 5, 258 A.2d 706.
We are persuaded that the judgment cannot withstand the application of Anderson. Before we apply Anderson, however, we will review briefly the law regarding professional standards in malpractice cases.
Ordinarily, a medical malpractice claim requires that "`the standard of practice to which [the defendant] failed to adhere must be established by expert testimony,'" Kelly v. Berlin, 300 N.J.Super. 256, 264-65, 692 A.2d 552 (App.Div.1997) (quoting Rosenberg ex rel. Rosenberg v. Cahill, 99 N.J. 318, 325, 492 A.2d 371 (1985)). However, experts are not needed to establish professional standards of care where either the doctrine of res ipsa loquitur or the doctrine of common knowledge applies. Id. at 265, 692 A.2d 552. Res ipsa loquitur allows an inference of negligence where: (1) the accident which produced a person's injury was one which ordinarily does not happen unless someone was negligent; (2) the instrumentality or agent which caused the accident was within the defendant's exclusive control; and (3) there is no indication in the circumstances that the injury was the result of plaintiff's own voluntary act or neglect. Buckelew v. Grossbard, 87 N.J. 512, 525, 435 A.2d 1150 (1981); Maciag, supra, 274 N.J.Super. at 460, 644 A.2d 647.
The common knowledge doctrine applies when "[t]he facts of a given case [are] such that the common knowledge and experience possessed by lay [persons] ... enable a jury to conclude, without expert testimony, in a malpractice action as in any other negligence action that a duty of care has been breached." Kelly, supra, 300 N.J.Super. at 265, 692 A.2d 552 (citing Klimko v. Rose, 84 N.J. 496, 503-04, 422 A.2d 418 (1980)). The trial of a common knowledge case is essentially the same as an ordinary negligence case, and the jury is permitted to supply the applicable standard of care. Rosenberg, supra, 99 N.J. at 325, 492 A.2d 371 (citations omitted).
Although related, res ipsa and common knowledge doctrine cases are different, as explained by our Supreme Court in Sanzari v. Rosenfeld, 34 N.J. 128, 167 A.2d 625 (1961):
In res ipsa cases, plaintiff need only prove his injury, and need not prove a standard of care or a specific act or omission. Ordinarily, the common knowledge doctrine is applied in a malpractice case after the plaintiff proves his injury and a causally related act or omission by the defendant.

[Id. at 141, 167 A.2d 625 (emphasis added).]
Thus, res ipsa cases only require plaintiff's showing of an injury; the establishment of a standard of care is not part of the plaintiff's case. By contrast, a common knowledge case requires plaintiff's proof of an injury and some act or failure to act by defendant that led to the injury.
All defendants in the present case accepted the premise that gas was pumped into Mrs. Chin through the exhaust line. We observe, therefore, that the case hinged primarily *359 on the jury's determinations regarding who did what with the exhaust line, rather than with regard to professional standards of care. Indeed, during colloquy preceding the testimony of plaintiff's expert, Dr. Piver, counsel for the hospital defendants conceded that this case is a common knowledge case "to the extent that if there is an incorrect hook-up, the jury can figure that out." We are persuaded, therefore, that the court did not err in submitting the case against the hospital defendants to the jury based on a common knowledge standard.
The hospital defendants contend that the trial court erred in not submitting the case against Dr. Goldfarb to the jury based on common knowledge, rather than on a standard of care to be supplied by expert testimony. To the extent that the court may have erred in this regard we conclude that the error was not "clearly capable of producing an unjust result." R. 2:10-2. Dr. Piver testified as an expert against Dr. Goldfarb. According to Dr. Piver, Mrs. Chin's death was the result of an improper connection of the Bard device to the hysteroscope, causing the introduction of gas into the uterus and the bloodstream. Dr. Piver opined that Dr. Goldfarb made the fatally incorrect connection. He also testified that Dr. Goldfarb had "a duty to observe, and should have observed, that the hook-up was not correct." Thus, the expert testimony against Dr. Goldfarb coincided with the theory accepted by all parties, that the incorrect connection of the exhaust line caused Mrs. Chin's death. In addition, Dr. Piver's testimony directly pointed the finger of blame at Dr. Goldfarb. In these circumstances, we perceive no harmful error.
We deem it unnecessary to describe in detail the testimony and evidence in this case. We are satisfied that the direct and circumstantial evidence and the inferences which reasonably could have been drawn from the evidence would have supported several theories of liability.
The jury could have determined that Dr. Goldfarb connected the exhaust line to the scope's outflow port. Alternatively, the jury could have found that Dr. Goldfarb did not connect the exhaust line to the outflow port, but bore some responsibility for Mrs. Chin's death because he did not recognize that gas was being pumped into his patient.
Regarding the nurses, the jury could have determined that one of them was responsible for the missing third clip on the exhaust line and that the disconnection of the exhaust line from the gas line facilitated the mistaken use of the exhaust line by Dr. Goldfarb or by a nurse. The jury could have found that the nurses were not qualified to work with the equipment; that one of them connected the exhaust line to a suction canister to which the suction tubing was attached; or that one of them left the loose exhaust line in a position where Dr. Goldfarb could have mistaken it for a suction tube. The jury could have determined that the hospital, through one of its employees, had assigned unqualified people to this procedure and had not required nurse Leib[2] to attend a training session regarding the Bard apparatus.
The evidence was conflicting and inconsistent. Leib's testimony and reasonable inferences drawn from it would have supported a finding that the exhaust line had been connected to the outflow port on the scope, and that Dr. Goldfarb had made the connection. Dr. Goldfarb denied that he had connected the exhaust line. His expert witness, Dr. Lefler, placed the blame on one of the nurses for allegedly connecting the exhaust line to the suction canister. Dr. Lefler's testimony was admissible because it was based, at least implicitly, on Dr. Goldfarb's testimony that he had not connected the exhaust line to the outflow port. Thus, if the jury found Dr. Goldfarb's testimony in this regard to be credible, it could have relied on Lefler's theory.
The jury, of course, had to make credibility decisions. They could have accepted some of a witnesses's testimony as credible and rejected the rest of it. They could have found the testimony of a witness to be entirely credible or incredible. The point is, there was no "smoking gun" in this case. There was no obvious resolution of what happened *360 in the operating room. There are only theories, the acceptance of which depended on the jury's evaluation of credibility and the inferences to be drawn from facts as found by them.
In these circumstances, the applicability of Anderson renders the jury's verdict virtually unassailable because each defendant had the burden of persuading the jury that it was not culpable. Thus, the verdict represents the jury's determination that Goldfarb, Leib, Hofgesang, and the hospital did not completely carry their burdens of exculpation. It is a determination which is rationally related to the evidence.
The judgment solely against Dr. Goldfarb is reversed. The case is remanded for entry of a judgment against the hospital defendants and Dr. Goldfarb in accordance with the jury's verdict.
NOTES
[1] There was testimony that the fluid entering the uterus must be circulated, i.e., replaced by fresh fluid. Otherwise, the fluid will become cloudy due to blood and other biological material, thereby impairing visualization of the uterus.
[2] Dr. Goldfarb's expert exonerated nurse Charles. Thus, there is a rational basis for the jury's determination that Charles was not liable.